[No. D043178. Fourth Dist., Div. One. July 30, 2004.]

MEDICAL STAFF OF SHARP MEMORIAL HOSPITAL et al., Petitioners,
v.
THE SUPERIOR COURT OF SAN DIEGO COUNTY, Respondent;
PENNY PANCOAST, Real Party in Interest.

**COUNSEL**

Higgs, Fletcher & Mack, John Morris and Richard D. Barton for Petitioners.

Manatt, Phelps & Phillips, Terri D. Keville; and Lois Richardson for California Healthcare Association as Amici Curiae on behalf of Petitioners.

No appearance for Respondent.

Stephan, Oringher, Richman & Theodora, Arthur R. Chenen, Robert M. Dato and Dean J. Smith for Real Party in Interest.

Bond Curtis, Charles Bond; Catherine I. Hanson and Gregory M. Abrams for California Medical Association as Amici Curiae on behalf of Real Party in Interest.

## OPINION

**BENKE, Acting P. J.**—In this original proceeding the trial court found the Medical Staff of Sharp Memorial Hospital et al. (the medical staff) acted improperly when it summarily suspended the staff privileges of Penny Pancoast, a medical doctor. Accordingly, the trial court ordered Dr. Pancoast's suspension be rescinded.

We grant the medical staff's petition for a writ of mandate and direct the trial court to vacate its order.

There is no dispute among the parties Dr. Pancoast was in no condition to admit patients at the time of her suspension. Indeed, by way of her response to the petition Dr. Pancoast concedes her disability. The record also shows that in the absence of her suspension, Dr. Pancoast planned to begin admitting patients to Sharp Memorial Hospital (Sharp). Under these circumstances, Business and Professions Code section 809.5, as well as the medical staff's bylaws, permitted the medical staff to summarily suspend Dr. Pancoast's admission privileges, subject to her right to a postsuspension hearing.

## FACTUAL BACKGROUND

### A. *Dr. Pancoast*

Dr. Pancoast is a duly licensed physician with an internal medicine practice. She obtained medical staff privileges at Sharp in 1991 and was reappointed for two-year periods in 1993, 1995, 1997 and 1999.

### B. *Dr. Pancoast's Personal Life*

Between 1996 and 2000 Dr. Pancoast experienced grave turmoil in her personal life. Her marriage dissolved and her son was diagnosed with a severe mental illness which appeared to be related to abuse inflicted by his father. Because Dr. Pancoast's former husband had failed to maintain the family's health insurance, Dr. Pancoast bore the cost of her son's hospitalization until her resources were consumed and she filed for bankruptcy.

In addition to these difficulties, in February 2000 Dr. Pancoast was the victim of a sexual assault.

### C. *Dr. Pancoast's Mental State*

Although as early as 1996 the medical staff had received information which indicated Pancoast was under severe emotional distress, the information the medical staff began receiving in early 2000 indicated her emotional situation was deteriorating. In February 2000 her privileges at Sharp were suspended because she had not completed a number of medical records.

On March 13, 2000, the chairman of Sharp's Wellbeing Committee wrote to Dr. Pancoast and indicated he had unsuccessfully attempted to contact her over the previous five days. She responded by sending the chairman a letter stating her mail had been accumulating for weeks and that she was providing full-time care for her son. According to Dr. Pancoast, she continued to be on "administrative leave."

On March 15, 2000, Sharp's Manager of Medical Staff Services had a telephone conversation with Dr. Pancoast. Dr. Pancoast sounded very agitated and related that her son's condition had deteriorated and he had suffered serious physical injuries. Dr. Pancoast recognized she was on a medical records suspension and stated she "can't do much more if she's 6 feet under." The next day the head of Sharp's Wellbeing Committee received correspondence from Dr. Pancoast's psychologist and psychiatrist which indicated she was "under an undue amount of stress."

On March 30, 2000, Dr. Pancoast had a telephone conversation with another hospital employee. The employee described Dr. Pancoast as "crying, angry, verbally wandering and unconnected." Dr. Pancoast related all of her personal problems to the employee and told the employee she had become suicidal and that her mental condition was "precarious."

On April 6, 2000, a doctor who temporarily rented office space to Dr. Pancoast wrote to the chief of staff at Sharp. The doctor stated that because of the havoc Dr. Pancoast had created at his office, he had asked her to leave. He reported instances of Dr. Pancoast "slurring her words" and calling "many consecutive days to cancel all of her office patients." He also asked that his correspondence be kept confidential because Dr. Pancoast appeared vindictive and he wanted to protect himself, his wife and office staff from her attacks and telephone calls.

On April 19, 2000, her psychiatrist and licensed clinical social worker sent Sharp another letter advising the hospital that Dr. Pancoast was receiving psychiatric treatment "for depressive symptoms and stress."

## D. *Sharp's Response*

Following Sharp's suspension of Dr. Pancoast for failure to complete medical records in February 2000, Sharp's Wellbeing Committee made several unsuccessful attempts to contact Dr. Pancoast.

On March 10, 2000, the Internal Medicine Supervisory Committee received two Quality Variance Reports concerning patients of Dr. Pancoast. The committee asked her to attend its next meeting because this appeared to be a "repetitive issue."

On April 4, 2000, Sharp's Medical Executive Committee advised Dr. Pancoast she needed to contact the chairman of the Wellbeing Committee and follow all reasonable recommendations it made.

On or about May 16, 2000, Dr. Pancoast met with the chairman of the Wellbeing Committee. Dr. Pancoast stated she had started seeing patients in her office and hoped to get her hospital privileges back as soon as possible. Dr. Pancoast also stated the hospital's concerns about her were not "of major significance" and the chief of staff had a vendetta against her.

Significantly, Dr. Pancoast stated she had stopped seeing the psychiatrist and the licensed clinical social worker who had been treating her. She explained that she no longer could afford the health care insurance which provided the mental health services she had been using.

On May 26, 2000, the Sharp employee responsible for the hospital's records advised the hospital's Manager of Medical Staff that Dr. Pancoast had completed 32 of the 34 medical charts which had caused her suspension but that the remaining two charts were still missing.

On May 30, 2000, Sharp was contacted by a patient Dr. Pancoast had recently treated. The patient had been referred to Dr. Pancoast by a Sharp emergency room physician. The patient reported that after giving the patient conflicting interpretations of laboratory results, Dr. Pancoast cancelled appointments on two successive days and failed repeatedly to provide the patient with a copy of the laboratory results which the patient wanted reviewed by a urologist. The patient also complained because Dr. Pancoast related to her intimate details of the treatment Dr. Pancoast's son was receiving and the abuse he had suffered. Finally, the patient reported Dr. Pancoast had asked her to write Sharp a letter minimizing the difficulty the patient had with Dr. Pancoast. The patient, who is a nurse, thought Dr. Pancoast was unstable.

On June 5, 2000, the Wellbeing Committee directed Dr. Pancoast to see a psychiatrist it designated on June 21, 2000.

On June 6, 2000, the Medical Executive Committee discussed Dr. Pancoast's ability to practice at Sharp Hospital. The committee authorized the chief of staff to summarily suspend Dr. Pancoast's clinical privileges if the medical records suspension was lifted before she had been cleared to resume practice by the psychiatrist designated by the Wellbeing Committee.

On June 19, 2000, Dr. Pancoast returned to the hospital with the two missing charts and completed her work in them.

On June 20, 2000, Dr. Pancoast asked the chief of staff to be taken off the medical records suspension. The chief of staff then advised Dr. Pancoast that he was summarily suspending her privileges based on her behavior and demeanor over the previous months. In a June 21, 2000, letter to Dr. Pancoast, the chief of staff stated: "You called me yesterday afternoon at approximately 3 p.m. to advise that you had completed all delinquent medical records. Accordingly you requested that your medical records suspension be lifted. Based on the authority given to me by the Medical Executive Committee, I advised you that your clinical privileges were summarily suspended, effective immediately."

The chief of staff's letter further stated: "The summary suspension is based on your actions and demeanor over the past several months, which cause the Medical Executive Committee to believe immediate action is required to protect the well being of prospective patients at Sharp Memorial Hospital."

The chief of staff's letter advised Dr. Pancoast the Medical Executive Committee would conduct a further meeting on the suspension and she would be required to attend the meeting. The meeting was held on June 29, 2000, and the Medical Executive Committee decided to continue the summary suspension. At the meeting, the chief of staff advised Dr. Pancoast that if she promptly resigned from the medical staff, Sharp would not be required to report her suspension to the Medical Board of California or the National Practitioner Data Bank.

On June 30, 2000, Dr. Pancoast advised the chief of staff she had decided to resign. The chief of staff advised her a written letter of resignation would be required. On July 5, 2000, Dr. Pancoast delivered a letter to the hospital which stated: "I plan to stop hospital coverage and plan to do clinic work with set hours." The chief of staff found this was not a formal resignation from the staff and advised Dr. Pancoast he was therefore required to report her suspension to the Medical Board of California and National Practitioner

Data Bank. On July 10, 2000, Dr. Pancoast sent the chief of staff a second letter in which she thanked him for accepting her resignation.

Notwithstanding Dr. Pancoast's resignation letter, on August 4, 2000, Sharp submitted an Adverse Action Report to the National Practitioner Data Bank. The report indicated Dr. Pancoast had been suspended from Sharp's attending staff and she had resigned while under investigation.

### E. *Dr. Pancoast's Attempts to Obtain Reinstatement*

On September 21, 2000, Dr. Pancoast's attorney wrote to the hospital and asked that arrangements be made to reinstate her staff privileges. The hospital responded that because Dr. Pancoast had resigned from the staff, she would be required to submit a new application which would be processed in a timely fashion.

On October 30, 2001, Dr. Pancoast sent the hospital a demand that her privileges be restored or in the alternative that she be provided a hearing. The hospital rejected her demand.

### TRIAL COURT PROCEEDINGS

On December 13, 2002, Dr. Pancoast filed a petition for a writ of mandate against the medical staff, Sharp and the chief of staff, Kenneth Roth. She alleged the hospital had acted improperly in suspending her privileges and in failing to provide her with a post-suspension hearing. She prayed for a writ which directed the hospital to either restore her privileges or provide her with a hearing. In addition she asked for damages to compensate her for the income she lost following the suspension and for the stigma the hospital's report of her suspension had caused her.

The trial court granted Dr. Pancoast's writ of mandate. Relying on its interpretation of Business and Professions Code section 809.5, the trial court found the hospital had no power to suspend Dr. Pancoast merely because she posed a threat to prospective patients, as opposed to actual patients. In its order, the trial court stated: "[I]t is hard to imagine how [Dr. Pancoast] could pose an 'imminent' threat to anyone if she had no patients at the hospital and could admit none due to her medical records suspension." The hospital filed a motion to reconsider which the trial court denied.

Sharp then filed a petition for a writ of mandate and we issued an order to show cause.

## DISCUSSION

### I

Extraordinary relief is appropriate here because, in light of Dr. Pancoast's pending damages claims, Sharp has no right of appeal from the order granting Dr. Pancoast's petition and because the issue presented is one of public safety affecting not only Sharp's power to suspend physicians, but the power of other hospitals in the state to act in similar situations. (See *City of Glendale v. Superior Court* (1993) 18 Cal.App.4th 1768, 1776 [23 Cal.Rptr.2d 305].)

### II

Business and Professions Code[1] section 809.5, subdivision (a), provides: "Notwithstanding Sections 809 to 809.4, inclusive, a peer review body may immediately suspend or restrict clinical privileges of a licentiate where the failure to take that action may result in *an imminent danger to the health of any individual*, provided that the licentiate is subsequently provided with the notice and hearing rights set forth in Sections 809.1 to 809.4, inclusive, or, with respect to organizations specified in Section 809.7, with the rights specified in that section." (Italics added.)

In addition to the provisions of section 809.5, Sharp's bylaws provide: "Whenever a member's conduct appears to require that immediate action be taken to protect the life or well-being of patient(s) or to reduce a *substantial and imminent likelihood of significant impairment of the life, health, or safety of* any patient, *prospective patient*, other person, the officers of the medical staff, the chief or vice chief of the department in which the member holds privileges, the medical executive committee, or any member of the medical executive committee, may summarily restrict or suspend the medical staff membership . . . ." (Italics added.)

The initial question we must resolve is whether, in permitting summary suspension where there is likely harm to prospective patients, Sharp's bylaws go beyond the scope of the summary suspensions permitted by section 809.5. Dr. Pancoast points out there is some inconsistency between the statute which requires imminent harm and the bylaws which permit summary suspension where the potential harm is to a class of unidentified patients who have not yet even sought treatment.

On further analysis the facial inconsistency disappears. We must begin by recognizing that the overriding goal of the state-mandated peer

---

[1] All further statutory references are to the Business and Professions Code unless otherwise indicated.

review process is protection of the public and that while important, physicians' due process rights are subordinate to the needs of public safety. (See *Webman v. Little Co. of Mary Hospital* (1995) 39 Cal.App.4th 592, 600–601 [46 Cal.Rptr.2d 90]; *Rhee v. El Camino Hospital District* (1988) 201 Cal.App.3d 477, 489 [247 Cal.Rptr. 244]; *Miller v. Eisenhower Medical Center* (1980) 27 Cal.3d 614, 626–627 [166 Cal.Rptr. 26, 614 P.2d 258].) " '[A] hospital which closes its eyes to questionable competence and resolves all doubts in favor of the doctor does so at the peril of the public' [citation], thereby undercutting the goal of the state's peer review mechanism. [Citation.]" (*Webman v. Little Co. of Mary Hospital, supra,* 39 Cal.App.4th at pp. 600–601.) As the court in *Rhee v. El Camino Hospital District, supra,* 201 Cal.App.3d at page 489 stated: "We do not wish to denigrate the importance of due process rights; however, it must be emphasized that this is not a criminal setting, where the confrontation is between the state and the person facing sanctions. Here the rights of the patients to rely upon competent medical treatment are directly affected, and must always be kept in mind. An analogy between a surgeon and an airline pilot is not inapt: a hospital which closes its eyes to questionable competence and resolves all doubts in favor of the doctor does so at the peril of the public."

Read in light of the overriding interest in public safety, section 809.5 protects prospective as well as identified patients. On any given day, it is self-evident an impaired physician poses just as much a threat to identified patients as to unidentified ones. The eventual patient who at the beginning of the day has not yet broken a bone or had a heart attack is entitled to just as much protection from impaired physicians as are the patients who have scheduled clinical appointments. In this regard we find the argument of the California Healthcare Association persuasive: "The Legislature's manifest intent to protect the public at large would be vitiated if a peer review body were required to name specific threatened patients before it could take action to suspend a physician whose conduct 'may result in an imminent danger.' [A] hospital and its medical staff cannot possibly know all of the specific patients whom a medical staff physician may be seeing in the hospital in the near future, and may not know any of the patients' identities at all. The medical staff and hospital simply cannot be precluded from acting based on who the victims might be."

■ Thus we reject Dr. Pancoast's argument that in considering harm to prospective patients, Sharp's bylaws go beyond what is permitted by section 809.5. Application of section 809.5 does not turn on whether patients are identified or unidentified; application of the power provided by the statute turns on whether the risk of harm, whether to identified or prospective patients, is in fact imminent. Because application of Sharp's bylaws also turns on whether harm is imminent, the bylaws are entirely consistent with the statute.

## III

■ The next question we are required to consider is whether the Medical Executive Committee had any basis upon which to conclude Dr. Pancoast represented such an imminent threat. As Sharp points out, the hospital's determination of this factual issue is entitled to deference and it should not be faulted for considering patient safety as its principal obligation. (See *Webman v. Little Co. of Mary Hospital, supra,* 39 Cal.App.4th at pp. 600–601; *Rhee v. El Camino Hospital Dist., supra,* 201 Cal.App.3d at p. 489; *Miller v. Eisenhower Medical Center, supra,* 27 Cal.3d at pp. 626–627.) Given the interests involved and the presumed expertise of the medical profession, in considering the summary suspension of staff privileges at a private hospital the trial court was bound by the substantial evidence standard of review. (*Cipriotti v. Board of Directors* (1983) 147 Cal.App.3d 144, 155 [196 Cal.Rptr. 367].) Under that standard the trial court was required "to determine whether the administrative findings are supported 'in the light of the *whole* record,' not merely that part of the evidence in the record or the interpretation thereof which the trial court decides to accept as more credible or probable, or which results from the trial court's substitution of its preferred resolution of conflicts" in the record. (*Id.* at pp. 153–154.)

The record is, as we noted at the outset, unambiguous with respect to Dr. Pancoast's mental condition at the time of the suspension. She had been suffering from severe emotional distress and had engaged in a series of bizarre acts and statements and open hostility towards others. Nowhere in the record or in her briefs does she deny the incidents occurred or that they were a matter of legitimate concern to the hospital. Thus the record is undisputed Dr. Pancoast did not have the ability to safely admit patients to the hospital and safely administer care to them at the time of her suspension. In this regard her brief in this proceeding is telling and convincing. She states: "In June 2000, real party in interest Penny Pancoast, M.D., a long time and well-respected member of the San Diego medical community, was suffering from severe emotional distress as the result of terrible problems in her personal life. Realizing she was not competent to practice medicine, she voluntarily ceased admitting patients to Sharp Memorial Hospital and was working with the Physician Well Being Committee, which was monitoring her treatment and recovery, to make sure she did not return to practice until she was able."

Although, in light of her brief, there can be no dispute that as of the time of her suspension she was not capable of safely admitting patients, there is a dispute about whether she intended to begin admitting patients as soon as her records suspension was lifted. Dr. Pancoast contends, and the trial court found, as of the date of her suspension she had no intention to begin

admitting patients. She contends she planned to wait until the evaluation required by the Wellbeing Committee was complete. Thus she contends that at the time she was suspended she posed no imminent threat to patients.

■ However, the only evidence which supports the trial court's finding that she did not intend to begin admitting patients are her earlier statements, made following her records suspension, that she was on "administrative leave." In contrast to this somewhat self-serving description of her status, the record contains a great deal of proof Dr. Pancoast did in fact intend to begin admitting patients as soon as she completed the unfinished patient records. As we have noted, she told the chairman of the Wellbeing Committee she looked forward to completing the needed records and admitting patients. Most importantly, on the day after she completed the last records, Dr. Pancoast asked the chief of staff to lift her records suspension. These circumstances fully support the conclusion Dr. Pancoast did in fact intend to begin admitting patients as soon as she completed the unfinished records. More importantly, these circumstances are more than sufficient to withstand the limited review permitted under the substantial evidence test. It bears emphasis that the question the trial court was required to determine was not whether in fact the trial court believed Dr. Pancoast intended to admit patients, but whether the medical staff acted reasonably in concluding she had such an intent. (*Cipriotti v. Board of Directors, supra,* 147 Cal.App.3d at p. 155.) Plainly, on the issue of Dr. Pancoast's intentions, this record meets that deferential standard.

■ We recognize that at the time the suspension was issued Dr. Pancoast was scheduled to meet with the psychiatrist selected by the Wellbeing Committee. Although the services and support of the Wellbeing Committee are required by the Joint Commission on Accredidation for Healthcare Organizations, the public protection which is the subject of section 809.5 cannot be subordinated to the rehabilitative needs of an individual physician. (See *Rhee v. El Camino Hospital Dist., supra,* 201 Cal.App.3d at p. 489.) Thus, Dr. Pancoast's cooperation with the Wellbeing Committee did not, per se, prevent the hospital from acting to protect patients under section 809.5.

As a factual matter Dr. Pancoast's cooperation with the Wellbeing Committee did not in any manner undermine the Medical Executive Committee's determination Dr. Pancoast was an imminent threat. On the date Dr. Pancoast was suspended, the psychiatric evaluation had not been made and the hospital had no basis upon which it could assume the evaluation would be favorable to Dr. Pancoast or that the evaluation process would be completed before Dr. Pancoast began admitting patients. In this context we cannot fault the hospital for resolving all doubt as to Dr. Pancoast's mental condition in favor of patient safety. (*Rhee v. El Camino Hospital Dist., supra,* 201 Cal.App.3d at p. 489.)

We reject Dr. Pancoast's contention the medical staff could have prevented harm to patients by simply extending her records suspension rather than suspending her as a risk to patients. Although continuation of the records suspension may have had less severe repercussions for Dr. Pancoast, because her records were apparently in order as of June 20, 2000, and because she in fact asked that the records suspension be lifted, the hospital could not without incurring liability to her extend the records suspension.

■ We also reject Dr. Pancoast's contention that the medical staff should have considered less drastic limitations on her practice. At the time Dr. Pancoast was suspended, Sharp had received a serious complaint from one of Dr. Pancoast's more recent patients and was aware Dr. Pancoast did not have access to her mental health providers. Given these circumstances we are not in a position to second-guess the medical staff's judgment that suspension rather than some less drastic limitation on Dr. Pancoast's practice would adequately protect the public. (*Rhee v. El Camino Hospital District, supra*, 201 Cal.App.3d at p. 489.)

■ In short, at the time the suspension was issued, the hospital had information that showed Dr. Pancoast could not safely admit patients and further showed, if granted privileges, she would attempt to do so. Under these circumstances section 809.5 authorized the hospital to prevent her from admitting patients pending a full hearing on whether her staff privileges should have been terminated.

Because the hospital acted properly under section 809.5 in suspending Dr. Pancoast's privileges, the trial court erred in granting her petition. Accordingly, we must grant Sharp's petition and direct the trial court to vacate its writ.[2]

## DISPOSITION

Let a writ of mandate issue directing the superior court to vacate its order of July 2, 2003, and to conduct such other further proceedings as are necessary and consistent with the views we have expressed. Petitioners to recover their costs in this writ proceeding.

Huffman, J., and Nares, J., concurred.

---

[2] Our determination is without prejudice to other claims Dr. Pancoast may wish to pursue, including inter alia, claims related to postsuspension statements made by the chief of staff, her reliance on those statements or the validity of her postsuspension resignation from the staff.