[No. E053414. Fourth Dist., Div. Two. Feb. 10, 2012.]

JOHN NESSON, Plaintiff and Appellant, v.
NORTHERN INYO COUNTY LOCAL HOSPITAL DISTRICT, Defendant
and Respondent.

66

## COUNSEL

Jeffer, Mangels, Butler & Mitchell, Joseph N. Demko and Matthew S. Kenefick for Plaintiff and Appellant.

DiCaro, Coppo & Popcke, Carlo Coppo, Michael R. Popcke, Shelley A. Carder; and Douglas Buchanan for Defendant and Respondent.

Opinion

**CODRINGTON, J.—**

I

INTRODUCTION

Plaintiff John Nesson, a radiologist, sued defendant Northern Inyo County Local Hospital District (Hospital) after the medical executive committee (MEC) summarily suspended his medical staff privileges and the Hospital terminated his contract to provide radiology services. Nesson's complaint seeks damages for breach of contract, retaliation, and discrimination. Nesson appeals from an order and judgment granting the Hospital's special anti-SLAPP motion to strike. (Code Civ. Proc., § 425.16.)

Nesson contends his claims against the Hospital are not subject to an anti-SLAPP motion. Additionally and in the alternative, he maintains he has established the probable validity of his claims. Based on our independent review, we conclude the trial court properly granted the anti-SLAPP motion.

II

FACTUAL AND PROCEDURAL BACKGROUND

We derive the statement of the facts from the complaint and from the evidence submitted in support of and against the anti-SLAPP motion. Many of the operative facts are essentially undisputed except where noted.

A. *The Radiology Services Agreement*

Nesson has been a licensed California physician since 1966 and a practicing radiologist since 1973.

On July 1, 2007, Nesson and the Hospital entered into the department of radiology service agreement (Agreement), providing that Nesson would "oversee, operate and administer the [Radiology] Department in accordance with applicable law." The Agreement was for a one-month term to be extended on a monthly basis and was terminable on 30 days' notice. The Agreement was in effect until February 19, 2009, when it was terminated by the Hospital.

Under the Agreement, Nesson was required to maintain membership on the Hospital's active medical staff with appropriate privileges to practice medicine at the Hospital. Nesson was responsible for the clinical competence and performance of all the licensed and certified personnel working in the clinic and "the operation and administration of the Department with respect to the provision of Radiology and related services for the care of the Hospital's

patients . . . ." Among other tasks, Nesson's responsibility was to provide professional services, including (1) assuring that tests, examinations, and procedures were properly performed, recorded and reported; (2) designing protocols and parameters for clinical testing; (3) recommending appropriate followup diagnostic testing; (4) selecting and evaluating test methodologies and procedures; (5) interacting with other members of the medical staff; (6) assuring that the radiology department complied with all applicable state and federal laws; (7) assuring that appropriate policies and procedures were in place; and (8) assuring that all department personnel received appropriate training and continuing education.

The Agreement also specifies that Nesson was "responsible to see that all procedures designated above, and other procedures requiring a Radiologic license, shall be performed only under the supervision of a licensed and qualified Radiologist." Nesson could also employ another licensed radiologist with clinical privileges to act as his substitute, a "locum tenens."[1] Nesson regularly employed several qualified radiologists as locum tenens.

Section 4.02 of the Agreement provides that "[i]n the performance of the work, duties and obligations under the Agreement, it is mutually understood and agreed that [Nesson] is at all times acting and performing as an independent contractor practicing his profession of medicine and specializing in Radiology." Nesson was compensated directly by patients, not by the Hospital.

In addition to radiology services, the Hospital paid Nesson $2,000 per month, later increased to $2,500, for performing related administrative, supervisory, and teaching services.

B. *The Events of 2008 and 2009*

In 2008, Nesson complained about the quality of transcription services and its impact upon patient safety. In June 2008, two of the transcriptionists, Allison Pennington and Alison Murray, responded by filing grievances, which were denied: "[Y]ou may be experiencing periods of anxiety because of the criticism and alleged slander that may have taken place, under any definition, what transpired does not constitute a hostile work environment." Nesson claims that, in December 2008, the Hospital requested he withdraw his complaints about patient safety and apologize to the transcriptionists.

In February 2009, the MEC voted to approve a summary suspension of Nesson's medical staff and clinical privileges, citing "recent incidents of

---

[1] " '[A] practitioner who temporarily takes the place of another.' (Dorland's Illus. Medical Dict. (26th ed. 1990) p. 756.)" (*Major v. Memorial Hospitals Assn.* (1999) 71 Cal.App.4th 1380, 1389, fn. 3 [84 Cal.Rptr.2d 510].)

substandard and dangerous patient care" and "abrupt change in your behavior characterized by volatile and erratic actions." Nesson was advised the summary suspension was based on "the MEC's determination that failure to so act may result in an imminent danger to patients." A summary suspension removes a physician from medical staff membership and restricts exercise of his clinical privileges. (See Northern Inyo Hospital Medical Staff Bylaws, § 7.2 (Bylaws).)

The MEC recommended Nesson undergo a neuropsychiatric evaluation and a clinical competency evaluation. If Nesson requested a leave of absence while undergoing the evaluations, the suspension would be lifted. The MEC also indicated it would continue its investigation of Nesson's behavior and clinical practice "until the [MEC's] corrective action investigation . . . is completed."

On February 19, 2009, the Hospital deemed it "impossible for you to comply with the requirements of the contract without Medical Staff privileges" and terminated the Agreement. Nesson's lawyer objected to the summary suspension on February 24, 2009.

On February 25, 2009, the Hospital sent a health facility/peer review reporting form to the Medical Board of California, as it was required to do pursuant to Business and Professions Code section 805 (section 805), informing the board of Nesson's summary suspension.

On March 2, 2009, the Hospital informed Nesson in writing of the fact the section 805 report had been made and, pursuant to the Bylaws, gave notice of his right to request a hearing to challenge the suspension. Nesson was also notified that his attorney's letter of February 24, 2009, did not comply with the requirements of the Bylaws for requesting a hearing. Nesson was further notified if he failed to request a hearing in the manner and time specified in the Bylaws, he would be deemed to have waived his right to any hearing, appeal, or other legal review of the corrective action.

On March 6, 2009, Nesson requested and was granted a voluntary leave of absence for 180 days. In view of the leave of absence, on March 11, 2009, the MEC lifted the summary suspension. The MEC's correspondence with Nesson included a copy of section 6.14.1 of the Bylaws which provides, in part, that "[d]uring the period of the leave, the Member shall not exercise Privileges at the Hospital, and membership rights and responsibilities shall be inactive . . . ." Nesson was also specifically informed that if he ever wished to request reinstatement, he "will be expected to document compliance with the evaluations specified" in connection with the summary suspension. Neither Nesson, nor his lawyer at the time, requested a hearing to challenge his summary suspension within the 30-day deadline set forth in the Bylaws.

Instead, on April 28, 2009, Nesson's new legal counsel asserted that Nesson had timely requested a hearing to challenge his summary suspension via a letter purportedly sent on March 16, 2009. Counsel for the medical staff confirmed no such letter was received and requested both a copy of the correspondence, as well as proof that it was delivered. In response, Nesson's counsel conceded there was no proof that such a letter was ever delivered and also declined to produce a copy of the letter.

On or about April 29, 2009, Nesson submitted an application for reappointment to the medical staff. However, he did not provide documentation that he had completed the evaluations requested by the MEC when it suspended him. Therefore, his application for reappointment was denied on June 11, 2009.

In the meantime, the Medical Board of California conducted an investigation regarding the alleged violations of section 805. After the Agreement was terminated the state board closed the investigation on May 5, 2010.

## C. *The Complaint*

After Nesson was denied reappointment, he filed a civil complaint for damages, asserting causes of action for (1) breach of contract; (2) breach of the covenant of good faith and fair dealing; (3) violation of Health and Safety Code section 1278.5; (4) violation of the Unruh Civil Rights Act (Civ. Code, § 51 et seq.); and (5) violation of the California Fair Employment and Housing Act (FEHA) (Gov. Code, § 12900 et seq.).

In summary, the grounds for Nesson's claims were that the Hospital had breached the Agreement by not giving him 30 days' notice of termination, had retaliated against him for his complaints about patient safety, and had discriminated against him for a perceived mental disability or medical condition.

## D. *The Anti-SLAPP Motion*

The Hospital filed a special motion to strike pursuant to the anti-SLAPP statute, Code of Civil Procedure section 425.16, arguing that the complaint targeted a protected activity—the suspension of Nesson's medical privileges—and Nesson could not demonstrate the probable validity of his claims because he did not exhaust his administrative or judicial remedies.

Nesson filed a motion for leave to conduct limited discovery under Code of Civil Procedure section 425.16, subdivision (g). The trial court granted Nesson limited discovery involving the Bylaws, rules, and regulations; the radiology department's rules and regulations; and information concerning

Nesson's suspension and termination. In its discovery responses, the Hospital asserted it terminated the Agreement based on Nesson's suspension by the medical staff's MEC, a separate, legal, independent entity.

The trial court granted the Hospital's special motion to strike, finding that (1) "all causes of action arise from alleged actions and conduct by the Defendant during medical peer review that qualify as official proceedings," citing *Kibler v. Northern Inyo County Local Hospital Dist.* (2006) 39 Cal.4th 192, 198 [46 Cal.Rptr.3d 41, 138 P.3d 193] (*Kibler*); (2) "all causes of action are barred under *Westlake Community Hospital v. Superior Court* (1976) 17 Cal.3d 465 [131 Cal.Rptr. 90, 551 P.2d 410]"; and (3) Nesson "failed to meet his burden to establish that there is a probability he will prevail on his claims." The trial court found that the contract termination was "inextricably intertwined with the MEC's summary suspension, arose from, and was in furtherance of the protected activity." The court entered judgment on April 1, 2011. Nesson appeals from the judgment.

### III

### THE ANTI-SLAPP STATUTE

Under Code of Civil Procedure section 425.16, "[a] cause of action against a person arising from any act of that person in furtherance of the person's right of petition or free speech . . . shall be subject to a special motion to strike . . . ." (§ 425.16, subd. (b)(1).) "A SLAPP suit—a strategic lawsuit against public participation—seeks to chill or punish a party's exercise of constitutional rights to free speech and to petition the government for redress of grievances. (*Briggs v. Eden Council for Hope & Opportunity* (1999) 19 Cal.4th 1106, 1109, fn. 1 [81 Cal.Rptr.2d 471, 969 P.2d 564].) The Legislature enacted Code of Civil Procedure section 425.16—known as the anti-SLAPP statute—to provide a procedural remedy to dispose of lawsuits that are brought to chill the valid exercise of constitutional rights. (*Lafayette Morehouse, Inc. v. Chronicle Publishing Co.* (1995) 37 Cal.App.4th 855, 865 [44 Cal.Rptr.2d 46].)" (*Rusheen v. Cohen* (2006) 37 Cal.4th 1048, 1055–1056 [39 Cal.Rptr.3d 516, 128 P.3d 713]; see *Flatley v. Mauro* (2006) 39 Cal.4th 299, 311–312 [46 Cal.Rptr.3d 606, 139 P.3d 2].) The purpose of the statute is to prevent the chilling of the valid exercise of these rights through "abuse of the judicial process" and, to this end, is to "be construed broadly." (§ 425.16, subd. (a); see *Flatley*, at pp. 312–313; *Kibler, supra,* 39 Cal.4th at p. 199.)

The anti-SLAPP statute establishes a two-step procedure whereby the trial court evaluates the merits of a plaintiff's cause of action, using a summary-judgment-like procedure, at an early stage of the litigation. (*Flatley v. Mauro, supra,* 39 Cal.4th at p. 312.) First, the defendant is

required to show that the cause of action arises from protected activity, i.e., activity by the defendant in furtherance of his constitutional right of petition or free speech. (Code Civ. Proc., § 425.16, subd. (b)(1); *Equilon Enterprises v. Consumer Cause, Inc.* (2002) 29 Cal.4th 53, 67 [124 Cal.Rptr.2d 507, 52 P.3d 685].)

If the trial court determines that the defendant has met his initial burden, the burden shifts to the plaintiff to demonstrate a reasonable probability of prevailing on the merits of his cause of action. (*Equilon Enterprises v. Consumer Cause, Inc., supra,* 29 Cal.4th at p. 67; *Gilbert v. Sykes* (2007) 147 Cal.App.4th 13, 22 [53 Cal.Rptr.3d 752]; Code Civ. Proc., § 425.16, subd. (b)(1).) "Put another way, the plaintiff 'must demonstrate that the complaint is both legally sufficient and supported by a sufficient prima facie showing of facts to sustain a favorable judgment if the evidence submitted by the plaintiff is credited.' [Citations.]" (*Wilson v. Parker, Covert & Chidester* (2002) 28 Cal.4th 811, 821 [123 Cal.Rptr.2d 19, 50 P.3d 733].)

■ The role of the trial court is not to weigh the credibility or comparative strength of the parties' evidence. (*Wilson v. Parker, Covert & Chidester, supra,* 28 Cal.4th at p. 821.) The court determines whether the defendant's evidence defeats the plaintiff's prima facie showing as a matter of law. (*Ibid.; Colt v. Freedom Communications, Inc.* (2003) 109 Cal.App.4th 1551, 1557 [1 Cal.Rptr.3d 245].) In attempting to establish the existence of a factual dispute, the opposing party may not rely upon the mere allegations or denials of its pleadings, but is required to tender evidence of specific facts in the form of affidavits, or admissible discovery material, in support of its contention that the dispute exists. (See *South Sutter, LLC v. LJ Sutter Partners, L.P.* (2011) 193 Cal.App.4th 634, 670 [123 Cal.Rptr.3d 301].)

■ We independently review orders granting or denying a motion to strike under Code of Civil Procedure section 425.16. (*Flatley v. Mauro, supra,* 39 Cal.4th at p. 325; *Gilbert v. Sykes, supra,* 147 Cal.App.4th at p. 22.) Only causes of action that satisfy both prongs of the anti-SLAPP statute, i.e., that arise from protected speech or petitioning activity and that lack even minimal merit are subject to being stricken under the anti-SLAPP statute. (*Navellier v. Sletten* (2002) 29 Cal.4th 82, 89 [124 Cal.Rptr.2d 530, 52 P.3d 703].)

■ Code of Civil Procedure section 425.16, subdivision (e)(2), provides that speech protected by the anti-SLAPP statute includes "any written or oral statement or writing made in connection with an issue under consideration or review by a legislative, executive, or judicial body, or any other official proceeding authorized by law." Certain types of proceedings may be treated as "other official proceeding authorized by law" under Code of Civil Procedure section 425.16, subdivision (e)(1), including hospital peer review

proceedings regarding a staff physician. (*Kibler, supra*, 39 Cal.4th 192, 199.) Even though the proceedings are conducted by private parties, the peer review procedure is required by law (Bus. & Prof. Code, § 805 et seq.), the proceedings are subject to judicial review (by administrative mandamus) and the proceedings involve "matters of public significance" (§ 425.16, subd. (a)) (quality of hospital care). (*Kibler, supra*, 39 Cal.4th at pp. 199–201; see *Smith v. Adventist Health System/West* (2010) 190 Cal.App.4th 40, 56 [117 Cal.Rptr.3d 805].)

Additionally, where the basis for the plaintiff's suit arises from peer review action, he will be barred from bringing a civil action for damages unless he has fully exhausted his administrative and judicial remedies. (*Westlake Community Hosp. v. Superior Court, supra*, 17 Cal.3d at pp. 476–477.) A plaintiff who has failed to exhaust his administrative and judicial remedies therefore cannot prove a probability of prevailing on any claim, irrespective of how it is labeled.

■ Where the anti-SLAPP statute applies and the plaintiff fails to establish that he has a probability of prevailing, the claims subject to the anti-SLAPP statute "shall be stricken." (*Simpson Strong-Tie Co., Inc. v. Gore* (2010) 49 Cal.4th 12, 21 [109 Cal.Rptr.3d 329, 230 P.3d 1117].)

IV

PROTECTED ACTIVITY

Nesson argues that his summary suspension and the subsequent termination of the Agreement did not constitute protected anti-SLAPP activity because the Hospital was not involved in the peer review process or his summary suspension. Furthermore, Nesson asserts his claims are based on the termination of the Agreement not on his summary suspension.

■ As already noted, the California Supreme Court has held that lawsuits arising from a challenge to hospital peer review activities, including the discipline imposed upon a physician, constitute " 'official proceeding[s] authorized by law.' " (*Kibler, supra*, 39 Cal.4th at p. 198.) In ruling that a medical peer review proceeding is an "official proceeding authorized by law," and thus covered under the anti-SLAPP statute, the *Kibler* court emphasized two points. First, hospitals are required to engage in medical peer review by a comprehensive statutory scheme. (Bus. & Prof. Code, § 800 et seq.; *Kibler*, at pp. 199–200.) Second, the Supreme Court noted that disciplinary action meted out against physicians during peer review is subject to judicial review through administrative mandamus and is therefore similar to the quasi-judicial process used by a wide variety of public agencies, whose decisions

are also subject to review by the courts in administrative mandamus proceedings. (39 Cal.4th at p. 200.)

The Business and Professions Code sets out a comprehensive scheme that incorporates the peer review process into the overall process for the licensing of California physicians. (*Kibler, supra*, 39 Cal.4th at p. 196.) The California Legislature states: "Sections 809 to 809.8, inclusive, shall not affect the respective responsibilities of the organized medical staff or the governing body of an acute care hospital with respect to peer review in the acute care hospital setting." (Bus. & Prof. Code, § 809, subd. (a)(8).) The statute recognizes the role of both a hospital and its medical staff in fulfillment of peer review.

■ An acute care hospital must have "an organized medical staff responsible to the governing body for the adequacy and quality of the care rendered to patients." (Cal. Code Regs., tit. 22, § 70703, subd. (a).) The medical staff acts in peer review through its governing body, the MEC. A hospital's medical staff bylaws govern its peer review proceedings, subject to the requirements of the peer review statutes. (*Payne v. Anaheim Memorial Medical Center, Inc.* (2005) 130 Cal.App.4th 729, 739, fn. 5 [30 Cal.Rptr.3d 230]; *Kaiser Foundation Hospitals v. Superior Court* (2005) 128 Cal.App.4th 85, 97 [26 Cal.Rptr.3d 744]; *Unnamed Physician v. Board of Trustees* (2001) 93 Cal.App.4th 607, 617, 622 [113 Cal.Rptr.2d 309]; see Bus. & Prof. Code, § 809, subd. (a)(8) ["It is the intent of the Legislature that written provisions implementing Sections 809 to 809.8, inclusive, in the acute care hospital setting shall be included in medical staff bylaws . . . ."].)

■ Here the Hospital's medical staff Bylaws specify in detail the procedural rights afforded in peer review matters, including the authority of the Hospital's district board, summarily to "restrict or suspend a Practitioner's Medical Staff membership or privileges (i.e., take 'Summary Action') whenever a Practitioner's conduct is such that failure to take action may result in an imminent danger to the health of any individual." A physician under summary suspension is given notice of the adverse action and his right to a hearing before an appointed hearing committee. A party may appeal the decision of that hearing committee. The final adverse action is taken by the Hospital's district board, not the MEC. A physician must exhaust all applicable hearing, appeal or other remedies afforded by the Bylaws before initiating legal action. A hospital's decision resulting from peer review is subject to judicial review by administrative mandate under Code of Civil Procedure section 1094.5. (Bus. & Prof. Code, § 809.8; see also *Kumar v. National Medical Enterprises, Inc.* (1990) 218 Cal.App.3d 1050, 1054 [267 Cal.Rptr. 452].)

Thus, the Hospital is required to deliver quality patient care through a peer review process executed by the medical staff based on authority delegated from the Hospital through its governing district board. (*Ellison v. Sequoia Health Services* (2010) 183 Cal.App.4th 1486 [108 Cal.Rptr.3d 728].) Two distinct organizations, the Hospital and the MEC, jointly participate in the peer review process: " '[T]he Legislature has granted to individual hospitals, acting on the recommendations of their peer review committees, the primary responsibility for monitoring the professional conduct of physicians licensed in California.' " (*Eight Unnamed Physicians v. Medical Executive Com.* (2007) 150 Cal.App.4th 503, 511 [59 Cal.Rptr.3d 100], quoting *Kibler, supra,* 39 Cal.4th at pp. 200–201; see Bus. & Prof. Code, § 809.) As noted in those cases, the final determination, or the actual corrective action taken, against a physician is taken by the hospital's district board, as distinguished from the medical staff's MEC.

 "The governing bodies of acute care hospitals have a legitimate function in the peer review process. In all peer review matters, the governing body shall give great weight to the actions of peer review bodies . . . ." (Bus. & Prof. Code, § 809.05, subd. (a); see also *Mileikowsky v. West Hills Hospital & Medical Center* (2009) 45 Cal.4th 1259, 1272 [91 Cal.Rptr.3d 516, 203 P.3d 1113].) The same statutory section acknowledges that in certain circumstances, the governing body can take corrective action, even if the peer review body does not, and mandates that "[a] governing body and the medical staff shall act exclusively in the interest of maintaining and enhancing quality patient care." (Bus. & Prof. Code, § 809.05, subd. (d).) A hospital, because of its ultimate responsibility for peer review and also for the safety of the hospital's staff and its patients, may act to prevent a physician from practicing medicine pending a full hearing on whether his or her staff privileges should have been terminated. (*Medical Staff of Sharp Memorial Hospital v. Superior Court* (2004) 121 Cal.App.4th 173, 185 [16 Cal.Rptr.3d 769], citing Bus. & Prof. Code, § 809.5.)

As noted above, the Hospital's medical staff Bylaws specifically identify the district board as a peer review body under the Bylaws. It further affords the district board the right to act immediately and summarily to restrict or suspend a practitioner's medical staff membership or privileges (i.e., take "Summary Action") whenever a practitioner's conduct is such that failure to take action may result in an imminent danger to the health of any individual.

 The Hospital's determination of the factual issues as to the necessity of peer review actions is entitled to deference and it should not be faulted for considering patient safety as its principal obligation. (*Medical Staff of Sharp Memorial Hospital v. Superior Court, supra,* 121 Cal.App.4th at p. 183.) The governing authority bears the responsibility for assuring that this goal is

achieved to the greatest extent possible, and its decisions relating to medical staff must take into account all factors which have a legitimate relationship to it. (*Miller v. Eisenhower Medical Center* (1980) 27 Cal.3d 614, 628 [166 Cal.Rptr. 826, 614 P.2d 258].)

Here, the Hospital gave deference to the MEC's determination that Nesson's erratic behavior and substandard and dangerous patient care could result in an imminent danger to patients and warranted summary suspension. The Hospital explained in its February 19, 2009, correspondence to Nesson that as a consequence of the continued summary suspension of his membership and privileges, it had become impossible for Nesson to comply with the Agreement and it was subject to termination pursuant to paragraph 4.06(a)1 of the Agreement.

The Hospital's governing district board took the additional step of determining that Nesson, given his suspended status, could not perform under the Agreement and terminated it. The Hospital terminated the Agreement in order to protect its patients, staff and the public, given the findings of the MEC, and as a necessary result of the corrective action being taken. The Hospital's action clearly falls within the "other matters critical to the hospital's functioning" that constitutes peer review. (*Kibler, supra,* 39 Cal.4th at p. 199.) This case is not like *Smith v. Adventist Health System/West, supra,* 190 Cal.App.4th at page 64, in which the court found that the "screen out" of a physician's reapplication for privileges was not a protected activity because it did not implement peer review procedures.

The trial court properly interpreted the Agreement as supporting the Hospital's termination based on the failure to maintain membership and privileges. As the trial court determined, the Hospital's action in terminating the Agreement was "inextricably intertwined" with the summary suspension and corrective action being taken against Nesson. Nesson's duties pursuant to the Agreement are "inextricably intertwined" with the practice of medicine. Accordingly, the Hospital's district board acted as a peer review body, in accordance with its medical staff Bylaws, in terminating the Agreement.

█ The Hospital was also authorized to impose its own disposition, based upon the MEC's finding. The Court of Appeal in *Ellison v. Sequoia Health Services* upheld the right of the governing board to apply its independent judgment regarding the disposition of corrective action, after giving due weight to the factual findings of the peer review committee. (*Ellison v. Sequoia Health Services, supra,* 183 Cal.App.4th at p. 1496.) The *Ellison* court said, " '[t]he governing bodies of acute care hospitals have a legitimate function in the peer review process.' " (*Ibid.*) The *Ellison* court went on to rule that "a hospital governing body may exercise its own independent judgment about

evidence presented to a peer review committee composed of medical staff, provided that it gives due weight to the findings of that committee . . . ." (*Id.* at pp. 1496–1497.)

■ "[T]he overriding goal of the state-mandated peer review process is protection of the public and . . . while important, physicians' due process rights are subordinate to the needs of public safety." (*Medical Staff of Sharp Memorial Hospital v. Superior Court, supra,* 121 Cal.App.4th at pp. 181–182.) A physician facing peer review is not entitled to the same due process protections as a criminal defendant. (*Ibid.*) The question, rather, is whether the procedure leading to the revocation of privileges was fair. (*Ellison v. Sequoia Health Services, supra,* 183 Cal.App.4th at p. 1498.)

Even a physician's cooperation with corrective action imposed by a hospital does not, per se, prevent the hospital from acting to protect patients and does not undermine the medical staff's determination that the physician was an imminent threat, as the public protection which is the subject of Business and Professions Code section 809.5 "cannot be subordinated to the rehabilitative needs of an individual physician." (*Medical Staff of Sharp Memorial Hospital v. Superior Court, supra,* 121 Cal.App.4th at p. 184.)

Nesson refused to cooperate with the investigation undertaken by the medical staff. He refused to submit to the requested evaluations, even when he attempted to obtain reappointment. He took a leave of absence and actively thwarted any determination as to whether he should have continued in his position as the medical director of radiology. He failed to challenge the Hospital's determination through the administrative and judicial peer review process.

Furthermore, failure to terminate Nesson's contract could have exposed the hospital to liability under *Elam v. College Park Hospital* (1982) 132 Cal.App.3d 332 [183 Cal.Rptr. 156]. In *Elam,* the appellate court found that a hospital "owes generally a duty to [e]nsure the competency of its medical staff and to evaluate the quality of medical treatment rendered on its premises." (*Id.* at p. 347.) The *Elam* appellate court stated further, "a hospital is accountable for negligently screening the competency of its medical staff to [e]nsure the adequacy of medical care rendered to patients at its facility." (*Id.* at p. 346.)

As in *Elam,* the Hospital was ultimately responsible for the competency of its medical director of radiology. As a suspended physician, Nesson could not discharge the duties and responsibilities of medical director of radiology on his own or by using substitute radiologists. Accordingly, the Hospital had the duty to terminate the Agreement.

■ Finally, this court must look to the essence of the contested conduct in order to determine if the suit arises from protected activity: "[A] plaintiff

cannot avoid operation of the anti-SLAPP statute by attempting, through artifices of pleading, to characterize an action as a garden variety tort or contract claim when in fact the claim is predicated on protected speech or petitioning activity. [Citation.] Accordingly, we disregard the labeling of the claim [citation] and instead 'examine the *principal thrust* or *gravamen* of a plaintiff's cause of action to determine whether the anti-SLAPP statute applies' and whether the trial court correctly ruled on the anti-SLAPP motion. [Citation.]" (*Hylton v. Frank E. Rogozienski, Inc.* (2009) 177 Cal.App.4th 1264, 1271–1272 [99 Cal.Rptr.3d 805].) Indeed, the Supreme Court has said: "the critical point is whether the plaintiff's cause of action itself was *based on* an act in furtherance of the defendant's right of petition or free speech. [Citations.]" (*City of Cotati v. Cashman* (2002) 29 Cal.4th 69, 78 [124 Cal.Rptr.2d 519, 52 P.3d 695].)

The gravamen of each cause of action asserted by Nesson is that the Hospital somehow acted wrongfully when it terminated the Agreement because Nesson's privileges were summarily suspended, as he was deemed by the MEC to be a likely imminent danger to patient safety.

With regard to the contract claims, Nesson argues that he could have employed other radiologists to perform the Agreement and that he did not receive 30 days' notice of termination. But the fundamental premise of Nesson's claims is the Hospital could not terminate him based on the summary suspension. The first prong of analysis "under the anti-SLAPP statute focuses on the acts on which liability is based, not the gestalt of the cause of action . . . ." (*Wallace v. McCubbin* (2011) 196 Cal.App.4th 1169, 1175 [128 Cal.Rptr.3d 205].)

Nesson's retaliation and discrimination claims are also founded on his contention that he could not be terminated based on the summary suspension. With regard to the FEHA and Unruh causes of action, Nesson maintains the Hospital terminated him for a perceived disability and refused to offer him accommodations. But the anti-SLAPP statute applies to claims made in connection with the protected activity, regardless of the defendant's motive, or the motive the plaintiff may be ascribing to the defendant's conduct. (*Navellier v. Sletten, supra*, 29 Cal.4th at pp. 89–90.) The only alleged evidence or argument in support of his claim that the Hospital perceived Nesson as disabled are the facts that the Hospital received the written special notice of summary action and the notice of medical executive committee action suspension. Nesson contends, "[b]ased on the above letters and a report from the MEC, the Hospital decided to terminate Nesson's Service Agreement." These letters and any alleged "report" are part of the peer review process.

Nesson fails to cite any evidence of retaliation or discrimination which is not connected with his summary suspension. The underlying allegedly improper acts are the MEC's summary suspension of Nesson's privileges, and therefore, by the Hospital, in terminating the Agreement. The retaliation, FEHA, and Unruh causes of action fail as the Hospital established its conduct falls under the first-prong analysis of *Kibler*.

V

PROBABILITY OF PREVAILING

Once the Hospital establishes its conduct warrants anti-SLAPP protection, the burden shifts to Nesson to produce evidence to establish a probability of prevailing on the merits of his claims. (*Equilon Enterprises v. Consumer Cause, Inc., supra,* 29 Cal.4th at p. 67.)

The defendant need not "make a preemptive factual showing to negate what [the plaintiff] might present to satisfy" his anti-SLAPP burden of establishing a probability of prevailing. (*Wong v. Jing* (2010) 189 Cal.App.4th 1354, 1369 [117 Cal.Rptr.3d 747]; accord, *Tuchscher Development Enterprises, Inc. v. San Diego Unified Port Dist.* (2003) 106 Cal.App.4th 1219, 1239 [132 Cal.Rptr.2d 57] ["it was not [the defendants'] burden to show [the plaintiff] *could not* demonstrate a probability of prevailing on its claims . . .'].) Nesson does not support his claims.

Courts have consistently required that any dispute over a doctor's competence to continue practicing medicine be submitted for a peer review determination before the dispute may proceed in court. (See, e.g., *Lee v. Blue Shield of California* (2007) 154 Cal.App.4th 1369 [65 Cal.Rptr.3d 612] [doctor required to exhaust remedy of peer review process before filing lawsuit despite health care service plan's wrongful denial of physician's right to peer review and termination of peer review hearing]; *Shahinian v. Cedars-Sinai Medical Center* (2011) 194 Cal.App.4th 987 [124 Cal.Rptr.3d 128]; *Eight Unnamed Physicians v. Medical Executive Com., supra,* 150 Cal.App.4th 503.)

*Westlake Community Hosp. v. Superior Court, supra,* 17 Cal.3d 465 is the seminal case on this issue. The Supreme Court established the steps a physician who claims he is the victim of faulty medical peer review must take to rectify the situation, before filing a lawsuit. First, the physician must fully exhaust his internal hospital administrative remedies. (*Id.* at p. 485.) Second, if the physician has fully exhausted his administrative remedies at the hospital but has failed to overturn the hospital's peer review negative disciplinary action against him, the physician is required to petition for

issuance of a writ of mandamus under Code of Civil Procedure section 1094.5 overturning the hospital's disciplinary action against him. (17 Cal.3d at p. 485.)

Only after the physician has obtained a Code of Civil Procedure section 1094.5 writ of mandamus setting aside the hospital's discipline of him, may the aggrieved physician file a civil lawsuit asserting state law claims against the hospital and its associated defendants: "[A]n exhaustion of remedies requirement serves the salutary function of eliminating or mitigating damages. If an organization is given the opportunity quickly to determine through the operation of its internal procedures that it has committed error, it may be able to minimize, and sometimes eliminate, any monetary injury to the plaintiff by immediately reversing its initial decision . . . ." (*Westlake Community Hosp. v. Superior Court, supra*, 17 Cal.3d at p. 476.)

Furthermore, "by insisting upon exhaustion . . . courts accord recognition to the 'expertise' of the organization's quasi-judicial tribunal, permitting it to adjudicate the merits of the plaintiff's claim in the first instance," and at a minimum promote "judicial efficiency by unearthing the relevant evidence and by providing a record which the court may review." (*Westlake Community Hosp. v. Superior Court, supra*, 17 Cal.3d at p. 476.) Finally, allowing improper damage actions has a chilling effect on peer review by discouraging participation in peer review which, in turn, affects patient safety. (*Kibler, supra*, 39 Cal.4th at p. 201.) Here, it is undisputed that Nesson failed to exhaust his administrative and judicial remedies before filing this lawsuit. Accordingly, all of his claims are barred.

Nesson claims that he could not have contested the termination of the Agreement in the peer review proceeding because "the administrative process is *only* available to challenge the suspension of Nesson's medical privileges." This argument misses the point because the issues are inextricably intertwined. In any event, Nesson abandoned the peer review process. He requested a leave of absence. He did not request a timely hearing. Although Nesson later sought reinstatement, he refused to provide the required neuropsychiatric and clinical competency evaluations.

Had Nesson pursued and completed his internal administrative remedies, leading to a lifting of the summary suspension, he could have sought reinstatement of the contract. This would have cured Nesson's material breach of the Agreement when he was suspended.

 A physician retains the right (and the duty) to fully exhaust his administrative remedies and appeals at the hospital. (*Eight Unnamed Physicians v. Medical Executive Com., supra*, 150 Cal.App.4th at

pp. 510–511.) Once the physician has fully exhausted his administrative remedies at the hospital, he may, if still aggrieved, petition the court for issuance of a writ of administrative mandamus under Code of Civil Procedure section 1094.5 overturning the hospital's negative disciplinary action taken against him. (*Lee v. Blue Shield of California, supra,* 154 Cal.App.4th at pp. 1378–1379.) Any physician who contends he is being or has been deprived of full hearing rights or "fair procedure," also has the right to petition immediately for issuance of a writ of administrative mandate under Code of Civil Procedure section 1085. (*Haller v. Burbank Community Hospital Foundation* (1983) 149 Cal.App.3d 650, 658–659 [197 Cal.Rptr. 45].) Nesson voluntarily and knowingly waived his right to a hearing and failed to exhaust his administrative and judicial remedies, barring the claims he asserts in this action. (*Westlake Community Hosp. v. Superior Court, supra,* 17 Cal.3d at p. 485.)

Even if Nesson had exhausted his remedies, he could not establish the probability of prevailing. The trial court properly interpreted the Agreement, in which Nesson's obligations necessitated that he be a member of the medical staff, in good standing. In an effort to distinguish this action from peer review, Nesson attempts to parse out duties under the Agreement claiming he was not required to practice medicine personally but could delegate his duties to other radiologists. But the Agreement is premised on the condition that, at all times, Nesson would be a good standing member of the medical staff, capable of exercising his clinical privileges and utilizing his clinical expertise in his duty to "oversee, operate and administer the [Radiology] Department." By virtue of his actions which led to his summary suspension, Nesson failed to fulfill his obligation to maintain active staff membership and privileges during the term of the Agreement.

Nesson also argues that while summarily suspended he could still have performed "administrative services" under the Agreement. However, his duties and responsibilities under the Agreement are not clearly segregated between clinical and nonclinically related functions. Nesson's Agreement is governed by section 10 of the Bylaws which outlines the services and service chiefs. Radiology is clearly designated under this section. Medical staff Bylaws section 10 requires "Each Service Chief shall be a Member of the Active Staff . . . ." Section 2.7 of the medical staff Bylaws states, "A Contract Practitioner may provide specified clinical services authorized pursuant to the applicable specified clinical services contract only if the Contract Practitioner is a Medical Staff member . . . ." The Agreement does not distinguish "Administrative Services" from "Radiology Services." In fact, these obligations could only be reasonably interpreted as being performed by a radiologist in good standing on the medical staff of the Hospital.

The interpretation of a contract is a judicial function. (*Wolf v. Walt Disney Pictures & Television* (2008) 162 Cal.App.4th 1107, 1125–1126 [76 Cal.Rptr.3d 585], citing *Pacific Gas & E. Co. v. G. W. Thomas Drayage etc. Co.* (1968) 69 Cal.2d 33, 39–40 [69 Cal.Rptr. 561, 442 P.2d 641].) In engaging in this function, the trial court " 'give[s] effect to the mutual intention of the parties as it existed' " at the time the contract was executed. (*Wolf*, at p. 1126, quoting Civ. Code, § 1636.) Ordinarily, the objective intent of the contracting parties is a legal question determined solely by reference to the contract's terms. (Civ. Code, §§ 1638, 1639; *Wolf*, at pp. 1125–1126.)

Nesson argues he "was **not** required to maintain medical privileges to perform the Administrative Services, as that did not involve treating patients." But he does not identify specific duties which do not somehow affect patient safety or which are not founded on the understanding they would be performed by a radiologist in good standing on the medical staff. The "Operational and Administrative Services" section in the Agreement is clearly founded upon the express understanding that Nesson would be performing these duties as a physician licensed in radiology and a good standing member of the medical staff.

Nesson's duties under the Agreement were inextricably intertwined with his capacity as a member in good standing of the medical staff with clinical privileges in Radiology. Based on the determination of the MEC that Nesson posed an imminent danger to patients, the hospital was duty bound, by its responsibilities to its staff and patients, to terminate the Agreement. (*Elam v. College Park Hospital, supra*, 132 Cal.App.3d 332.)

As a suspended physician, Nesson could not possibly have fulfilled the enumerated obligations under the Agreement. In an action upon a contract, the plaintiff must allege and prove either performance or a valid excuse for nonperformance. (*Estate of Warner* (1910) 158 Cal. 441, 445 [111 P. 352]; *Peek v. Steinberg* (1912) 163 Cal. 127, 133 [124 P. 834].) As Nesson cannot prove this essential element, he cannot prevail on a breach of contract.

Tort damages are inapplicable in ordinary contract actions. (*Freeman & Mills, Inc. v. Belcher Oil Co.* (1995) 11 Cal.4th 85, 102 [44 Cal.Rptr.2d 420, 900 P.2d 669].) A breach of contract is tortious only when some independent duty arising from tort law is violated. (*Erlich v. Menezes* (1999) 21 Cal.4th 543, 552–554 [87 Cal.Rptr.2d 886, 981 P.2d 978].) No such duty exists here.

Nesson's claim for retaliation under Health and Safety Code section 1278.5 also fails because the evidence shows the summary suspension was unrelated to the complaints he offered about transcriptions and patient safety made more than eight months before the agreement was terminated.

Regarding Nesson's discrimination claims, the FEHA requires the Hospital to know or be aware of Nesson's alleged disability. (*Faust v. California Portland Cement Co.* (2007) 150 Cal.App.4th 864, 887 [58 Cal.Rptr.3d 729].) Without such knowledge, the Hospital had no way of knowing if Nesson was, indeed, disabled, or whether it could accommodate Nesson. (*King v. United Parcel Service, Inc.* (2007) 152 Cal.App.4th 426, 443 [60 Cal.Rptr.3d 359].) In this case, the Hospital initiated an investigation, but Nesson refused to cooperate, so whether or not a disability or reasonable accommodation existed could not be determined. The MEC had decided a failure to suspend Nesson summarily "may result in an imminent danger to patients" based on "recent incidents of substandard and dangerous patient care and on an observed abrupt change in [his] behavior characterized by volatile and erratic actions." At the time the Agreement was terminated, the evaluations had been requested to determine whether Nesson could perform his job. The MEC had initiated an investigation to learn whether corrective action was warranted but Nesson refused to comply.

Nesson is also unable to state a claim for violation of the Unruh Civil Rights Act, which protects the rights of individuals "no matter what their . . . disability . . . to the full and equal accommodations . . . ." (Civ. Code, § 51, subd. (b).) Under the Unruh Civil Rights Act, the term "disability" means any mental or physical disability as defined in the FEHA. (Civ. Code, § 51, subd. (e)(1).) In order for any impairment to amount to a "disability" it must have an adverse impact on the employee's ability to do his job. As noted above, although there is evidence the Hospital requested Nesson undergo certain evaluations, there is no actual evidence Nesson was disabled. Nesson waived any claims when he failed and refused to cooperate with the evaluations requested by the peer review committee. Thus, neither the summary suspension nor the termination of the Agreement amounted to a deprivation of full and equal accommodation under the Unruh Civil Rights Act. The Unruh claims would also fail.

VI

DISPOSITION

The trial court properly found all causes of action arose from alleged actions and conduct by the Hospital during medical peer review that qualify as official proceedings under Code of Civil Procedure section 425.16. It further found all causes of action barred under *Westlake Community Hosp. v. Superior Court, supra,* 17 Cal.3d 465, due to Nesson's failure to exhaust his administrative and judicial remedies before filing this action. Finally, Nesson failed to meet his burden to establish a probability he would prevail on any of his claims.

We affirm the judgment. The Hospital, the prevailing party, shall recover its costs on appeal.

McKinster, Acting P. J., and Miller, J., concurred.