Filed 5/20/22  Melamed v. Cedars-Sinai Medical Center CA2/1

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION ONE

| | |
|---|---|
| HOOMAN MELAMED, | B263095 |
| Plaintiff and Appellant, | (Los Angeles County Super. Ct. No. BC551415) |
| v. | |
| CEDARS-SINAI  MEDICAL CENTER et al., | ORDER MODIFYING OPINION AND DENYING REHEARING |
| Defendants and Respondents. | [NO CHANGE IN JUDGMENT] |

THE COURT:

It is ordered that the opinion filed herein on April 21, 2022, be modified as follows:

1.  On page 45, delete the first full sentence, stating:  "It is not clear how this could be construed as a grievance, complaint, or report about patient safety concerns, within the meaning of Health and Safety Code section 1278.5."  In the following sentence, delete the words "made in a forum where he could have expected the statements about inadequate equipment to be elevated as a whistleblower complaint to the appropriate staff or to accreditation or government entities," and replace them with "presented as a grievance, complaint, or report about patient safety concerns within the meaning of Health and Safety Code section 1278.5, i.e., a grievance, complaint, or report to be elevated to an

1

accreditation or government entity," so the full sentence now reads: "Dr. Melamed's statements to physicians who were investigating *his* patient care were not presented as a grievance, complaint, or report about patient safety concerns within the meaning of Health and Safety Code section 1278.5, i.e., a grievance, complaint, or report to be elevated to an accreditation or government entity."

2. In the first full sentence on page 50, delete the words "peer review process lacked due process or was" and replace them with "medical staff's investigation of his conduct was improper or," so the full sentence now reads: "He has not obtained administrative or judicial findings that the medical staff's investigation of his conduct was improper or unfair; that the summary suspension should not have been imposed; or that the summary suspension should not have been reported to the Medical Board of California or the National Practitioner Data Bank."

There is no change in the judgment.

Appellant's petition for rehearing is denied.
NOT TO BE PUBLISHED

_____

CHANEY, J.                                              CRANDALL, J.*

I would grant appellant's petition for rehearing.

_____

BENDIX, Acting P. J.

* Judge of the San Luis Obispo County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

Filed 4/21/22  Melamed v. Cedars-Sinai Medical Center CA2/1 (unmodified opinion)
Opinion following transfer from Supreme Court

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION ONE

| | |
|---|---|
| HOOMAN MELAMED, | B263095 |
| Plaintiff and Appellant, | (Los Angeles County Super. Ct. No. BC551455) |
| v. | |
| CEDARS-SINAI  MEDICAL CENTER et al., | |
| Defendants and Respondents. | |

APPEAL from an order of the Superior Court of Los Angeles County, Michael M. Johnson, Judge.  Affirmed in part, reversed in part, and remanded with directions.

Greene Broillet & Wheeler, Mark T. Quigley, Scott H. Carr, Christian T.F. Nickerson; Esner, Chang & Boyer and Stuart B. Esner for Plaintiff and Appellant.

Glaser Weil Fink Howard Avchen & Shapiro, Patricia L. Glaser, Joel N. Klevens; Greines, Martin, Stein & Richland,

1

Robin Meadow, and Jeffrey E. Raskin for Defendants and Respondents.

_____

On July 15, 2011, the medical staff of Cedars-Sinai Medical Center (Cedars) summarily suspended Hooman Melamed, M.D.'s privileges to perform back surgeries in scoliosis and kyphosis cases, after Dr. Melamed's operation on a 12-year-old scoliosis patient resulted in complications and necessitated a second, corrective surgery.  In a year-long peer review hearing that began in September 2012 and concluded in November 2013, Dr. Melamed challenged the summary suspension of his privileges (and other recommendations of Cedars's medical staff).  The Hearing Committee concluded, among other things, the summary suspension was reasonable and warranted when it was imposed on July 15, 2011 but, at the time of the Hearing Committee's decision in January 2014, the portion of the initial suspension that remained in effect should be terminated and Dr. Melamed's privileges reinstated, with prospective review of his clinical management in pediatric and adolescent scoliosis cases.  Dr. Melamed pursued administrative appeals of the recommendations not in his favor, and the Hearing Committee's findings, conclusions, and recommendations were upheld.

In July 2014, Dr. Melamed filed this action against Cedars and four of its physicians who were involved in the summary suspension decision, William Brien, M.D., Rick Delamarter, M.D., Michael Langberg, M.D., and Neil Romanoff, M.D. (collectively, defendants).  In a first amended complaint, Dr. Melamed alleged defendants' conduct in connection with the summary suspension and its aftermath was wrongful and damaged his career.  Specifically, he alleged all actions defendants took against him—

including the summary suspension—were retaliatory because he reported conditions and services at Cedars that threatened patient care and safety. Defendants filed an anti-SLAPP[1] motion under Code of Civil Procedure section 425.16,[2] arguing all Dr. Melamed's claims arose out of protected activity—the peer review process—and Dr. Melamed could not show a probability of success on the merits on any of his causes of action. The trial court granted the anti-SLAPP motion, dismissed Dr. Melamed's first amended complaint with prejudice, and found defendants were entitled to recover attorney fees.

Dr. Melamed appealed. On February 27, 2017, we issued an opinion affirming the trial court's order of dismissal. The Supreme Court granted Dr. Melamed's petition for review and transferred the matter to this court for reconsideration in light of a Supreme Court decision in an anti-SLAPP case issued after our opinion. Upon reconsideration, on October 6, 2017, we issued an opinion reversing the trial court's order of dismissal. The Supreme Court granted defendants' petition for review and deferred further action pending disposition in two other anti-SLAPP cases before the Court. On September 15, 2021, the Supreme Court transferred the matter to this court for reconsideration in light of *Wilson v. Cable News Network, Inc.* (2019) 7 Cal.5th 871 (*Wilson*) and *Bonni v. St. Joseph Health System* (2021) 11 Cal.5th 995 (*Bonni*). For the reasons explained below, upon reconsideration, we affirm in part and reverse in part the trial court's order of dismissal.

---

[1] SLAPP is the acronym for strategic lawsuit against public participation.

[2] Undesignated statutory references are to the Code of Civil Procedure unless otherwise noted.

3

**BACKGROUND**

Dr. Melamed is a board-certified orthopedic spine surgeon, licensed to practice medicine in California, who has had privileges to practice at Cedars since 2004.

## I. The Surgery

On July 11, 2011, Dr. Melamed performed the elective scoliosis-correction surgery that led to the summary suspension of his privileges by Cedars's medical staff. Dr. Melamed approved the equipment to be used during the surgery, including the operating table ("the Jackson table") and the hip and thigh pads to stabilize his 12-year-old patient, D.W. He positioned D.W. on the Jackson table and was satisfied with her positioning and stability at the outset of the surgery.

During surgery, however, Dr. Melamed noticed D.W.'s pelvis was slipping through an opening in the Jackson table, altering the alignment of her spine. He asked the nursing staff for larger hip and thigh pads to help him stabilize her position, but he was told such pads were not available. He asked nurses to go under the table, push up her pelvis, and hold it still. Dr. Melamed did not close D.W.; he continued to operate. He extended the incision up her spine and fused her higher vertebrae. Her position on the table continued to shift, and she continued to slip through the bolsters that were placed in attempts to stabilize her position. Dr. Melamed asked the nursing staff to see if there was a four-poster operating table available, so he could transfer D.W. to that table and complete the surgery. He was told such a table was not available.

Realizing he would not be able to complete the surgery because of the continuing problems with D.W.'s position on the table, Dr. Melamed placed a temporary rod in her spine and

4

decided he would perform another corrective surgery on her in a few days. What Dr. Melamed originally believed would be a simple surgery lasted more than eight hours. D.W.'s lordosis (inward curvature of the lumbar spine) was worse after the surgery, and she had abrasions on her face and body due to the number of hours she spent on the operating table.

Dr. Melamed told D.W.'s parents there were some mechanical problems with the table and pads during surgery. He explained to them that he would request the appropriate table and pads and bring D.W. back into the operating room soon for a corrective surgery. He also offered to help them obtain a second opinion.

## II. Nursing/Operating Room Staff Report the Surgery for Potential Review, and the Peer-Review Investigation Commences

Early in the morning on July 12, 2011, immediately after the surgery, a nurse who came in to assist in transferring D.W. from the Jackson table to a hospital bed expressed concern about the appearance of D.W.'s spine. After hearing from staff who were present in the operating room that the curvature of D.W.'s spine was worse after the surgery, the nurse decided to file a formal electronic incident report through the MIDAS event reporting system.[3]

---

[3] Pursuant to Cedars's policy, any individual, including a medical staff member, who witnesses or discovers an "event" must document that event in MIDAS by the end of his or her work shift. The written policy defines "event" as "any occurrence that could be inconsistent with the provision of high-quality patient care, or any event that could adversely affect the health or safety of patients ......."

5

In the early evening on July 13, 2011, a Cedars operating room manager, who had observed D.W. earlier that day and had spoken with her parents, emailed Dr. William Brien, Executive Vice Chairman for the Department of Surgery at Cedars. In his capacity as Executive Vice Chairman, Dr. Brien was required to and regularly participated in physician peer review matters. In the email, the manager informed Dr. Brien that D.W. had dermal abrasions on her face due to the length of the surgery. D.W.'s father told the manager that D.W. was now " 'barrel chested' compared to [her] previous state" before surgery. According to the manager's email, D.W.'s parents said Dr. Melamed told them: D.W. was too small for the Jackson table, and she "slipped" when he was trying to place a rod in her spine. The rod also "slipped," so he needed to perform a corrective surgery. To do so, he needed an operating table that Cedars did not have. As stated in the email, the manager reassured D.W.'s parents that Cedars had the necessary equipment for the corrective surgery. The parents requested referrals for a second opinion, and the manager provided them. After speaking with D.W.'s parents, the manager asked Dr. Melamed what equipment he needed for the corrective surgery, and he stated he could "use the slider with gel bolsters." As stated in the manager's email, the manager assured Dr. Melamed that Cedars would accommodate this equipment request.

By morning on July 14, 2011, Dr. Brien had decided to expedite the peer review investigation regarding D.W.'s surgery because D.W. remained at Cedars awaiting a corrective surgery. The same day, Dr. Brien interviewed Dr. Melamed. According to Dr. Melamed's declaration in opposition to defendants' anti-SLAPP motion, Dr. Brien began the interview by asking him:

" 'Are you going around the hospital and telling everyone that Cedars doesn't have the capability to do this case?' " In the same declaration, Dr. Melamed stated: "In response [to the above question], I told him [Dr. Brien] what happened during the surgery, and explained that it had been difficult to stabilize the patient due to the inadequate table/pads. I told him that the nursing personnel had told me that the correct table/pads were not available. I further told him that I had done other cases like this at Cedars before, and had never had any problems. I also told him that this case was supposed to be simple and straightforward, and that if I would have had the correct table/pads, the patient would have had a successful surgical outcome similar to my other cases." Dr. Melamed's declaration does not state what he told Dr. Brien regarding conversations with others about equipment issues during the surgery.

According to Dr. Brien's account of his July 14, 2011 interview with Dr. Melamed, as memorialized in Dr. Brien's notes, Dr. Melamed denied telling anyone, including D.W.'s parents, that Cedars did not have available the appropriate surgical table.[4] Dr. Brien's notes from the interview also state:

---

[4] Dr. Brien's notes from his July 14, 2011 interview with Dr. Melamed are attached to his supplemental declaration, filed with defendants' reply brief in support of their anti-SLAPP motion. In his original declaration in support of the anti-SLAPP motion, Dr. Brien also discussed his July 14, 2011 interview with Dr. Melamed. In the trial court, Dr. Melamed filed written objections to all supplemental declarations defendants filed, arguing it was impermissible for defendants to submit new evidence with their reply brief. In response, defendants argued the trial court had discretion to allow the evidence because the evidence was responsive to matters Dr. Melamed raised for the

7

Dr. Melamed explained that he chose the Jackson table for the surgery, as it was the table he had always used for this type of surgery. He positioned D.W. on the Jackson table before he operated. With hindsight, Dr. Melamed believed he should have closed D.W. earlier and moved her to another table with bolsters to complete the surgery. He also stated he chose the wrong table for the surgery because he did not realize how small D.W. was in comparison to the other patients for whom he had used a Jackson table. Dr. Melamed also explained to Dr. Brien that after the surgery, he asked if Cedars had available a four-poster table or a table with gel rolls and was told Cedars had the latter. He planned to do the corrective surgery on D.W. at Cedars in a few days. Dr. Brien inquired about Dr. Melamed's operating report, which was supposed to be prepared within 24 hours of the surgery. Dr. Melamed told Dr. Brien he would dictate the report that evening (three days after the surgery).

Notations on Dr. Melamed's operating report show that it was dictated on July 14, 2011 (after his interview with Dr. Brien) and transcribed the following day on July 15, 2011, at a time not specified. In the operating report, Dr. Melamed described what

first time in his opposition to the anti-SLAPP motion. The trial court agreed with defendants and overruled Dr. Melamed's evidentiary objections. We have no cause to review this ruling because Dr. Melamed has presented no legal argument on the matter to this court, only a statement in a footnote in his supplemental opening brief upon remand, indicating he "maintains that the Supplemental Declaration [of Dr. Brien] should not be considered in evaluating [d]efendants' evidence in support of the anti-SLAPP motion." With this statement, Dr. Melamed has not demonstrated an abuse of discretion by the trial court.

8

occurred during the surgery (including the unavailability of the equipment he requested mid-surgery) and what he told D.W.'s parents thereafter regarding "mechanical problems" with the table and pads during surgery and his plan to request the appropriate equipment for the corrective surgery.[5] There is no evidence in the record indicating Dr. Melamed's operating report was available for review before the decision to summarily suspend his privileges was finalized.

Dr. Melamed did not document any equipment issues in the MIDAS event reporting system or the MD Feedback Program, two systems for reporting patient care and safety concerns, per Cedars's written policies.

III. **The Summary Suspension and Notice of Charges**

After discussing D.W.'s case with multiple physicians, Dr. Brien formed the opinion that Dr. Melamed posed an immediate and imminent risk to hospital patients, including D.W. whom Dr. Melamed planned to bring back into surgery in a few days. Dr. Brien consulted with the Chair of the Department of Surgery, who concurred with Dr. Brien's recommendation that Cedars's medical staff impose a summary suspension of Dr. Melamed's privileges. Both were concerned about Dr. Melamed's judgment in continuing the surgery although he was unable to stabilize D.W. on the operating table. After receiving their recommendation, defendant Dr. Neil Romanoff, the Vice President for Medical Affairs, consulted with the Chief of Staff, and then decided to impose the summary suspension.

---

[5] The portions of Dr. Melamed's operating report that are germane to this appeal are summarized above in the section of this opinion describing the surgery.

9

On July 15, 2011, Cedars's medical staff sent Dr. Melamed a Notice of Action (signed by Dr. Romanoff), informing him that, effective immediately, his privileges to treat scoliosis and kyphosis in adult, pediatric and adolescent patients were summarily suspended after determination that failure to suspend such privileges might result in imminent danger to Cedars's patients. The notice stated the summary suspension was based on D.W.'s surgery, explaining: "This case raises concerns regarding your judgment, technical skill, and competency in managing scoliosis cases. These concerns are based on your choice of the wrong table for the patient's size and procedure, your failure to adequately stabilize the patient, and your continued attempts to manipulate the patient's spine despite your inability to stabilize her.[6] In addition, the surgery lasted in excess of 11 hours, which apparently contributed to the pressure areas [abrasions] that the patient sustained."[7] The notice invited Dr. Melamed to provide a written response to the charges by July 21, 2011.

The July 15, 2011 Notice of Action also stated the medical staff anticipated contacting Dr. Melamed within 14 days "to provide a final determination on this action." The notice further informed him that if the suspension remained in effect for more

---

[6] Although Dr. Melamed had indicated to Dr. Brien on July 14, 2011 that the Jackson table he chose for D.W.'s surgery was not the appropriate operating table given D.W.'s size, the doctor who performed the corrective surgery on D.W. on July 18, 2011, a couple days after Dr. Melamed's summary suspension, used the Jackson table.

[7] According to Dr. Melamed, the surgery lasted between eight and nine hours.

than 14 days, Cedars would report it to the Medical Board of California and the National Practitioner Data Bank pursuant to Business and Professions Code section 805, and Dr. Melamed would be entitled to request a peer review hearing.

On July 21, 2011, through his attorney, Dr. Melamed responded to the July 15, 2011 Notice of Action in a letter to Dr. Romanoff. Therein, Dr. Melamed denied he posed an imminent threat to patient safety and asserted he was not afforded a meaningful opportunity to respond to the concerns of the Department of Surgery. He did not assert in the letter that there were mechanical problems or equipment issues during D.W.'s surgery. Rather, he asserted the Jackson table was "medically appropriate for this type of surgical procedure," and he pointed out that the doctor who performed the subsequent corrective surgery on D.W. also used the Jackson table. Dr. Melamed also stated D.W. "was stabilized when the procedure commenced, and remained stabilized for a significant period of time thereafter."

The medical staff's investigation continued. The medical staff reviewed some of Dr. Melamed's other scoliosis and kyphosis cases and found concerns with a few of them. The medical staff sent Dr. Melamed requests for information regarding the cases under investigation, including D.W.'s case.

On July 27, 2011, Dr. Melamed filed a petition for a writ of mandate (§§ 1085, 1094.5) against Cedars in the superior court (case No. BS133178), seeking to set aside the summary suspension and prevent Cedars from reporting the summary suspension to the Medical Board of California or the National Practitioners Data Bank, among other relief. He asserted the summary suspension was improper because (1) it was imposed by a hospital administrator and not a peer review body, and (2) he

11

was deprived of a fair procedure to challenge it. He did not assert in the petition that there were mechanical problems or equipment issues during D.W.'s surgery. Rather, like he did in his July 21, 2011 letter to Dr. Romanoff (discussed above), he asserted in the petition that the Jackson table was "medically appropriate for this type of surgical procedure, and in fact, was used by the surgeon who later did a revision surgery on the patient." He also repeated in the petition his statements that D.W. "was stabilized when the procedure commenced" and "for a significant . . . period of time during the procedure."[8]

On July 27, 2011, the same day Dr. Melamed filed the above-described petition for writ of mandate, Dr. Brien met with five other physicians to review information regarding Dr. Melamed's patient care. Based on the information before them, the group unanimously recommended that Dr. Melamed's summary suspension remain in effect due to patient safety concerns, according to Dr. Brien's declaration in support of defendants' anti-SLAPP motion. The following day, on July 28, 2011, Dr. Brien sent Dr. Melamed a letter, confirming a meeting for the next day, and asking Dr. Melamed to provide information Dr. Brien had previously requested regarding some of Dr. Melamed's scoliosis and kyphosis cases, including D.W.'s case.

On July 29, 2011, Dr. Brien and Dr. Delamarter met with Dr. Melamed to discuss Dr. Melamed's patient care in several cases. According to Dr. Melamed's declaration in opposition to the anti-SLAPP motion, he told Drs. Brien and Delamarter during the meeting that "it had been difficult to stabilize [D.W.]

_____

[8] In November 2011, Dr. Melamed voluntary dismissed the action in which he filed the July 27, 2011 petition for writ of mandate against Cedars.

12

due to the inadequate table/pads," and "none of this would have happened had the correct pads/table been available." After the meeting, Drs. Brien and Delamarter recommended the summary suspension remain in effect.

On August 1, 2011, Cedars's medical staff sent Dr. Melamed an Amended Notice of Action, informing him the summary suspension of his privileges to treat scoliosis and kyphosis in adult, pediatric and adolescent patients remained in effect, based on D.W.'s case as well as the other enumerated cases the medical staff identified during its review of his other surgeries. The amended notice also explained that Dr. Melamed's statements during the July 29, 2011 meeting did not assuage the medical staff's concerns about these cases, and the medical staff believed failure to maintain the summary suspension might result in imminent danger to Cedars's patients and employees.

The August 1, 2011 Amended Notice of Action also informed Dr. Melamed that the summary suspension would be reported to the Medical Board of California and the National Practitioner Data Bank (and it was), as required by law, because the summary suspension had been in effect for more than 14 days.[9] The amended notice also apprised Dr. Melamed of his hearing rights. Finally, the amended notice advised Dr. Melamed to provide the information that had been requested in earlier correspondence regarding the enumerated patient cases. The amended notice explained that if he did not provide the information, or the information he provided did not resolve the medical staff's concerns, the medical staff would recommend that

---

[9] These reports are included in the record on appeal.

13

his privileges to treat scoliosis and kyphosis in adult, pediatric and adolescent patients be terminated.

On August 11, 2011, Dr. Melamed sent patient medical records to Dr. Brien with a letter explaining, "the Department should now have all or substantially all of the salient documentation necessary to complete a thorough review of my performance in each case."

## IV.   Peer Review Hearing and Administrative Appeal

On August 29, 2011, Dr. Melamed requested a peer review hearing to challenge the summary suspension.

On September 21, 2011, Cedars's medical staff sent Dr. Melamed a Second Amended Notice of Action, informing him that after meeting with him again and reviewing materials he provided, the medical staff recommended his privileges to treat scoliosis and kyphosis in pediatric patients be terminated. The second amended notice also informed him the medical staff was lifting the summary suspension of his privileges to treat scoliosis and kyphosis in adult cases and imposing a proctoring requirement with respect to such cases.[10] The second amended notice stated Cedars would construe Dr. Melamed's August 29, 2011 request for a peer review hearing on the summary suspension to include the recommendation for termination of privileges and the proctoring requirement.

---

[10] Cedars made a supplemental report to the Medical Board of California, noting these changes to the recommendations.

14

The peer review hearing was held over multiple sessions between September 2012 and November 2013. The Hearing Committee heard testimony from 17 witnesses and received into evidence around 60 exhibits.

On January 13, 2014, the Hearing Committee issued its report. The Hearing Committee's findings and conclusions regarding the summary suspension state in full:

"a.    Dr. Melamed admitted and performed surgery with instrumentation and occipital fusion on adolescent scoliosis patient [D.W.] on July 11, 2011. Before surgery, Dr. Melamed treated [D.W.] as an outpatient in his office for several years. Dr. Melamed's office record satisfactorily recorded the progression of her condition, his treatment of her and the indications for surgery. Although clinical judgment may differ whether [D.W.] was an appropriate candidate for surgery with her degree of spinal curvature, the preponderance of evidence was that Dr. Melamed's rationale for operating on the patient was reasonable.

"b.    The Department of Surgery acted reasonably in conducting an investigation of the case because of the routine nature of the case, unsatisfactory correction of the patient's spinal curvature and the harm to the patient of a worsened post-surgical spinal curvature, pressure sores, an extended fusion, a prolonged hospitalization and a second surgery.

"c.    The ad hoc committee of the Department of Surgery that investigated the case reasonably concluded that, based on the information available to it at the time, (i) Dr. Melamed[] failed initially to realize that the patient was losing position on the operating table, (ii) Dr. Melamed extended the fusion inappropriately and (iii) the failure to suspend Dr. Melamed's clinical privileges to treat patients with scoliosis or kyphosis with

15

instrumentation and with or without occipital fusion may result in imminent danger to prospective patients.

"Based upon the foregoing findings, the [Hearing Committee] concludes that (i) the Staff sustained its burden to prove by a preponderance of the evidence that, based on the information reasonably available in July of 2011, the failure to take action may have resulted in imminent danger to the health of a patient and it was necessary to act immediately and (ii) the summary suspension of Dr. Melamed's clinical privileges to treat scoliosis and kyphosis with instrumentation with or without occipital fusion in adult, adolescent and pediatric patients was reasonable and warranted." The Hearing Committee further recommended the summary suspension now be terminated and Dr. Melamed's privileges be reinstated.

As stated in the January 13, 2014 report, the Hearing Committee also made findings and conclusions regarding Cedars's medical staff's recommendations in the September 21, 2011 Second Amended Notice of Action: (1) that Dr. Melamed's privileges to treat scoliosis and kyphosis in adolescent and pediatric patients be terminated and (2) that Level III proctoring be imposed with respect to Dr. Melamed's privileges to treat scoliosis and kyphosis in adult patients. The Hearing Committee concluded the above-described recommendation regarding termination of privileges "was not reasonable and warranted. However, it would be reasonable and warranted for the Medical Executive Committee to authorize a prospective review of the clinical management of Dr. Melamed's pediatric and adolescent scoliosis cases by a method to be determined by the Department of Orthopedic Surgery." The Hearing Committee concluded the

above-described recommendation regarding Level III proctoring "should not be imposed."

Cedars's Medical Executive Committee "endorsed" the findings, conclusions, and recommendations in the Hearing Committee's report.

Through the administrative process, Dr. Melamed appealed the Hearing Committee's findings and conclusions regarding the summary suspension and the recommendation for prospective review of the clinical management of his pediatric and adolescent scoliosis cases. Both Cedars's Appeal Committee and later its Board of Directors upheld the Hearing Committee's findings, conclusions, and recommendations.

## V. The Present Action

On July 11, 2014, Dr. Melamed filed this action. In his first amended complaint, filed on July 21, 2014, he asserted causes of action against defendants for: (1) retaliation against a whistleblower in violation of Health and Safety Code section 1278.5; (2) tortious interference with prospective economic relations; (3) tortious interference with contractual relations; (4) unfair competition in violation of Business and Professions Code section 17200 et seq.; (5) violation of the Cartwright Act (Bus. & Prof. Code, § 16700 et seq.; (6) retaliation against a health care practitioner who advocates for appropriate health care for a patient in violation of Business and Professions Code sections 510 et seq. and 2056 et seq.; and (7) wrongful termination of hospital privileges.

Dr. Melamed alleged he "identified, reported and disclosed certain suspected unsafe and substandard conditions and services at [Cedars] that were a threat to patient care and safety." He did not describe these alleged conditions and services

17

in the first amended complaint.  He asserted defendants engaged in the following wrongful conduct to harass, exclude, humiliate, intimidate, and retaliate against him for identifying, reporting, and disclosing the unspecified unsafe and substandard conditions and services at Cedars:

"(1) Suspending [his] medical staff privileges to treat scoliosis and kyphosis with instrumentation with or without occipital fusion in adult, pediatric and adolescent patients[;]

"(2) Unilaterally taking retaliatory action against [him] without affording him due process, a hearing, an investigation, or any other meaningful opportunity or procedural protection for [him] to address the summary suspension before it was issued[;]

"(3) Reporting [his] summary suspension to the Medical Board of California and National Practitioner Data Bank, as well as other persons/entities[;]

"(4) Abusing the powers of the peer review process and subjecting [him] to a lengthy and humiliating peer review process for over two years, and by refusing to lift [his] summary suspension despite recommendations by several separate boards/committees to do so[;]

"(5) Ongoing hostility in the work environment;

"(6) Obstructing other economic and career opportunities for [him];

"(7) Failing to protect [him] from retaliation for whistleblowers and adverse actions;

"(8) Intolerable working conditions; and [*sic*]

"(9) Engaging in a campaign of character assassination which caused irreparable damage to [his] reputation;

"(10) Depriving [him] of his property right and interest to use certain hospital facilities and privileges[;]

18

"(11) Interfering with [his] right to practice his occupation[; and]

"(12) Wrongfully terminating [his] hospital privileges[.]"

In this action, filed three years after D.W.'s surgery, was the first time Dr. Melamed claimed defendants imposed the summary suspension (and upheld it) in retaliation because he reported patient safety concerns—i.e., the unavailability of adequate equipment during D.W.'s surgery.

## VI. Defendants Anti-SLAPP Motion

### A. Moving papers

Under section 425.16—the anti-SLAPP statute—a "cause of action against a person arising from any act of that person in furtherance of the person's right of petition or free speech under the United States Constitution or the California Constitution in connection with a public issue shall be subject to a special motion to strike, unless the court determines that the plaintiff has established that there is a probability that the plaintiff will prevail on the claim." (§ 425.16, subd. (b)(1).)

In September 2014, defendants filed an anti-SLAPP motion, contending the trial court should strike all causes of action in Dr. Melamed's first amended complaint under section 425.16 because they all arose from protected activity—the peer review process—and Dr. Melamed would not be able to meet his burden of showing a probability of success on the merits of any cause of action. Defendants cited *Kibler v. Northern Inyo County Local Hospital Dist.* (2006) 39 Cal.4th 192, 198 (*Kibler*), in which our Supreme Court held "a lawsuit arising out of a [hospital disciplinary] peer review proceeding is subject to a special motion under section 425.16 to strike the SLAPP suit." In anticipation of Dr. Melamed's opposition to the anti-SLAPP motion and his

19

attempt to show a probability of success on the merits, defendants argued this action is barred as a matter of law by failure to exhaust judicial remedies and the statute of limitations.[11]

## B. Dr. Melamed's opposition

In his opposition, Dr. Melamed argued defendants' conduct alleged in the first amended complaint—retaliation against him for reporting patient safety concerns at Cedars—did not arise from the peer review process or any other activity protected under the anti-SLAPP statute. He stated the peer review "proceedings were simply one of the manifestations of defendants' retaliatory and tortious conduct directed at [him]." On the merits, Dr. Melamed asserted he had a probability of prevailing on his claims because: (1) he was not required to exhaust judicial remedies because the present action does not challenge his summary suspension or any of the peer review findings; (2) none of his causes of action is barred by the statute of limitations;[12] (3) regardless of the applicable statute of limitations, his causes of action survive under equitable tolling and continuing violation doctrines; and (4) he presented sufficient evidence supporting

---

[11] In the anti-SLAPP motion, in support of their arguments as to the merits of Dr. Melamed's causes of action, defendants referred the trial court to arguments they made in their demurer, which was filed before the anti-SLAPP motion and set to be heard on the same date. Defendants included the demurrer in their Respondent's Appendix on appeal.

[12] Dr. Melamed argued the three-year statute of limitations under section 338 applies to his first and sixth causes of action— the statutory retaliation claims.

each element of his claims to show a probability of prevailing on the merits.[13]

Dr. Melamed submitted his own declaration, with attached exhibits, in support of his opposition to the anti-SLAPP motion.[14] Therein, he stated his inability to stabilize D.W.'s pelvis during the surgery, and the worsening of the scoliosis and arch in her back as a result of the surgery, were "solely caused by the inadequate table and pads and not due to [his] judgment or technical skills." He added: "I believed that the inadequate and substandard hospital equipment which caused these intraoperative issues constituted serious patient safety concerns that were unsafe and posed a significant health risk for current and future patients utilizing the services and medical facilities at Cedars." Therefore, he told the patient's parents, "[W]e had some mechanical problems with the table and pads during surgery." When Dr. Brien contacted him on July 14, 2011 to interview him as part of the peer review investigation, he told Dr. Brien "it had been difficult to stabilize [D.W.] due to the inadequate table/pads," and "if [he] would have had the correct table/pads, [D.W.] would have had a successful surgical outcome similar to [his] other cases." In his operating report, dictated after his July 14, 2011 interview with Dr. Brien and transcribed on July 15,

---

[13] In support of his arguments as to the merits of his causes of action, Dr. Melamed referred the trial court to arguments he made in his opposition to defendants' demurer. Defendants included that opposition in their Respondent's Appendix on appeal.

[14] Some of the statements in Dr. Melamed's declaration are quoted above in the background chronology of events and are not repeated here.

21

2011 (the same day the summary suspension was imposed), Dr. Melamed discussed the unavailability of the equipment he requested mid-surgery, as well as his statements to D.W.'s parents regarding the mechanical problems with the equipment and his plan to request the appropriate equipment for the corrective surgery.

Dr. Melamed claims in his declaration that the July 15, 2011 summary suspension of his privileges "was done in retaliation for [his] reports regarding the inadequate and substandard hospital equipment at Cedars." On July 29, 2011, during an interview with Drs. Brien and Delamarter as part of the peer review process, Dr. Melamed repeated the comments he had made to Dr. Brien on July 14, 2011 regarding the equipment issues during D.W.'s surgery. Dr. Melamed further claims in his declaration that the medical staff's decision to "to keep the summary suspension in effect" for more than 14 days, necessitating reports to the Medical Board of California and the National Practitioner Data Bank, "constituted retaliation against [him] for [his] reports of patient safety concerns at Cedars." He also claims the amended notices of charges and lengthy peer review hearing and appeals were the result of retaliation for the same reports of patient safety concerns.

Dr. Melamed attached to his declaration an August 23, 2011 letter from Saint John's Health Center (Saint John's), stating that his privileges to perform surgeries at Saint John's were summarily suspended based on: (1) his summary suspension at Cedars; (2) his failure to disclose the Cedars summary suspension to Saint John's medical staff as required by the medical staff bylaws; and (3) "the adverse outcome of [a] spinal patient" Dr. Melamed treated at Saint John's. He also

22

attached to his declaration an October 21, 2013 letter from Coventry Health Care National Network, stating his application for inclusion in the network was denied "based on a history of hospital privilege issues."

Dr. Melamed further stated in his declaration: "I was also placed on monitoring at Marina Del Rey hospital [*sic*] and Olympia Medical Center because of Cedars'[s] retaliatory actions against me. At Olympia Medical Center, I was told in writing that I can't do any spine cases by myself and always must have another spine surgeon present as an assistant. Every time I apply for reappointment at any medical facility, I will have to explain why I was suspended at Cedars. In addition, although Defendant Cedars reinstated my privileges in May of 2014, I can no longer practice there because of ongoing hostility in the work environment and fear of further retaliation against me."

C.   **Defendants' reply**

In the reply brief in support of the anti-SLAPP motion, defendants argued the following, in pertinent part, in response to Dr. Melamed's showing as to the merits of his claims: (1) Dr. Melamed's second through seventh causes of action are barred by his failure to exhaust judicial remedies because he did not file a petition for writ of administrative mandate under section 1094.5 to overturn the peer review decision; (2) his first and sixth causes of action—the statutory retaliation claims—fail because he did not make a complaint or report regarding patient safety concerns within the meaning of the statutes; (3) the first and sixth causes of action are barred by the two-year statute of limitations under section 340; and (4) the second and third causes of action for tortious interference with economic and contractual relations fail because defendants are immune from liability for making reports

23

to the Medical Board of California and National Practitioner Data Bank.

### D.    Trial court's ruling on the anti-SLAPP motion

On February 23, 2015, the trial court heard oral argument from the parties on defendants' demurrer to Dr. Melamed's first amended complaint and defendants' anti-SLAPP motion. On February 27, 2015, the trial court issued a ruling and a signed order, granting defendants' anti-SLAPP motion, dismissing Dr. Melamed's first amended complaint with prejudice, and stating defendants were entitled to recover their attorney fees. The court overruled defendants' demurrer as moot.

In granting the anti-SLAPP motion, the trial court found defendants demonstrated this action "revolves around [Cedars]'s summary suspension, governmental report [to the Medical Board of California and the National Practitioner Data Base], and peer review proceedings, which are all protected activity" under the anti-SLAPP statute. On the second step of the anti-SLAPP analysis, the trial court found Dr. Melamed did not show a probability that he could succeed on any of the causes of action in his first amended complaint because: (1) the second through seventh causes of action are barred by his failure to exhaust judicial remedies because he "did not overturn any aspect of the peer review process"; and (2) his first cause of action for retaliation against a whistleblower in violation of Health and Safety Code section 1278.5 fails because he "has not presented evidence supporting a prima facie case."

## VII.  Our February 27, 2017 Opinion in This Appeal

Dr. Melamed appealed from the trial court's order on the anti-SLAPP motion. On February 27, 2017, we issued a published opinion in this case, affirming the trial court's order.

We concluded all causes of action in Dr. Melamed's first amended complaint arise from protected activity within the meaning of the anti-SLAPP statute because they arise out of the hospital's peer review process in relation to a summary suspension, and the act of summarily suspending Dr. Melamed's privileges was a part of the peer review process.

On the second step of the anti-SLAPP analysis, we concluded Dr. Melamed cannot show a probability of prevailing on his cause of action for retaliation against a whistleblower in violation of Health and Safety Code section 1278.5 because he did not show that he presented a grievance, complaint, or report to Cedars or the medical staff regarding the quality of patient care, within the meaning of the statute, or that the hospital retaliated against him for doing so. We also concluded he cannot show a probability of prevailing on his remaining causes of action because he did not exhaust his judicial remedies by seeking mandamus review of the peer review determinations.

In support of our conclusion Dr. Melamed's causes of action arise from protected activity under the anti-SLAPP statute, we relied on *Kibler*, *supra*, 39 Cal.4th at page 198, in which our Supreme Court held "a lawsuit arising out of a [hospital disciplinary] peer review proceeding is subject to a special motion under section 425.16 to strike the SLAPP suit." We also relied on *Nesson v. Northern Inyo County Local Hospital Dist.* (2012) 204 Cal.App.4th 65, 78 (*Nesson)*, in which the Fourth District Court of Appeal characterized *Kibler* as holding that hospital peer review proceedings, including the discipline imposed upon a physician, constitute official proceedings authorized by law, and thus constitute protected activity under the anti-SLAPP statute. On May 4, 2017, a little over a month after we issued our

25

February 27, 2017 opinion in this case, our Supreme Court clarified the scope of *Kibler* and disapproved *Nesson* in *Park v. Board of Trustees of California State University* (2017) 2 Cal.5th 1057 (*Park*), a case in which a professor filed a discrimination action against a university that denied his application for tenure.

The Supreme Court explained in *Park*, *supra*, 2 Cal.5th 1057 that "a claim is not subject to a motion to strike simply because it contests an action or decision that was arrived at following speech or petitioning activity, or that was thereafter communicated by means of speech or petitioning activity. Rather, a claim may be struck only if the speech or petitioning activity *itself* is the wrong complained of, and not just evidence of liability or a step leading to some different act for which liability is asserted." (*Id.* at p. 1060.) In concluding the professor alleged conduct by the university that is not protected under the anti-SLAPP statute, the Supreme Court explained, "What gives rise to liability is not that the defendant spoke, but that the defendant denied the plaintiff a benefit, or subjected the plaintiff to a burden, on account of a discriminatory or retaliatory consideration." (*Id.* at p. 1066.) The Court also stated, "*Kibler* does not stand for the proposition that disciplinary decisions reached in a peer review process, as opposed to statements in connection with that process, are protected." (*Id.* at p. 1070.) The Court disapproved *Nesson* as having "overread" *Kibler*. (*Kibler*, *supra*, 39 Cal.4th at p. 1070.)

Dr. Melamed filed a petition for review of our February 27, 2017 decision. On June 21, 2017, the Supreme Court issued an order granting the petition for review and transferring the matter to this court for reconsideration in light of *Park*, *supra*, 2 Cal.5th 1057.

26

## VIII. Our October 6, 2017 Opinion in This Appeal

On October 6, 2017, we issued an unpublished opinion in this case reversing the trial court's order granting defendants' anti-SLAPP motion, upon reconsideration in light of *Park, supra,* 2 Cal.5th 1057. We concluded Dr. Melamed's claims do not arise from protected activity under the anti-SLAPP statute because the basis for Dr. Melamed's assertion of liability is defendants' alleged retaliatory motive in suspending Dr. Melamed and subjecting him to a lengthy and allegedly abusive peer review proceeding. We relied on *Bonni v. St. Joseph Health System* (2017) 13 Cal.App.5th 851, 861, a decision issued by the Fourth District Court of Appeal a couple months before our October 6, 2017 opinion, which concluded the anti-SLAPP statute does not apply to a surgeon's cause of action for retaliation against a whistleblower in violation of Health and Safety Code section 1278.5 because the claim "*arises from* defendants' retaliatory purpose or motive, and not from how that purpose is carried out, even if by speech or petitioning activity" in connection with peer review proceedings. On November 1, 2017, the Supreme Court granted review in *Bonni.*

Defendants filed a petition for review of our October 6, 2017 decision. The Supreme Court granted the petition and deferred further action in the matter pending consideration and disposition of related issues in *Wilson, supra,* 7 Cal.5th 871 and then *Bonni, supra,* 11 Cal.5th 995. As discussed in more detail below, the Supreme Court held in *Wilson* that allegations of discriminatory or retaliatory motive do not exclude a claim from the scope of the anti-SLAPP statute if the conduct is otherwise protected under the statute, expressly disapproving the Fourth District Court of Appeal's decision in *Bonni v. St. Joseph Health*

27

*System*, *supra*, 13 Cal.App.5th 851. (*Wilson*, at pp. 881, 892.) In *Bonni*, the Supreme Court discussed "the scope and limits" of the anti-SLAPP statute's protections for conduct "in connection with hospital peer review." (*Bonni*, at p. 1004.)

On September 15, 2021, the Supreme Court transferred this matter back to this court for reconsideration in light of the Court's decisions in *Wilson* and *Bonni*.

## IX. Dr. Melamed's May 2017 Petition for a Writ of Administrative Mandate

We briefly discuss here another case Dr. Melamed filed that is germane to our analysis in this appeal. On May 4, 2017, while the present matter was pending in the Supreme Court the first time, Dr. Melamed filed in the superior court a petition for a writ of administrative mandate against Cedars and its Board of Directors, challenging the summary suspension of his privileges (case No. BS169534). In his opening brief in support of the petition, he explained he was not challenging the July 15, 2011 decision to *impose* the summary suspension; rather, he was challenging the August 1, 2011 decision to *continue* the summary suspension for more than 14 days, necessitating reports to the Medical Board of California and the National Practitioner Data Base. The trial court denied the petition on multiple grounds, including that Dr. Melamed failed to exhaust his administrative remedies because, during the peer review hearing, he did not challenge the August 1, 2011 decision to continue the summary suspension; his only challenge to the summary suspension during the peer review hearing was to the July 15, 2011 decision to impose the summary suspension. On March 22, 2021, we issued an unpublished opinion dismissing Dr. Melamed's appeal from the order denying his petition because he failed to exhaust his

28

administrative remedies. (*Melamed v. Cedars-Sinai Medical Center* (Mar. 22, 2021, B292794) [nonpub. opn.].)[15]

## DISCUSSION

## I. Anti-SLAPP Analysis and Standard of Review

The "anti-SLAPP statute is designed to protect defendants from meritless lawsuits that might chill the exercise of their rights to speak and petition on matters of public concern." (*Wilson, supra*, 7 Cal.5th at pp. 883-884.) Thus, a "cause of action against a person arising from any act of that person in furtherance of the person's right of petition or free speech under the United States Constitution or the California Constitution in connection with a public issue shall be subject to a special motion to strike, unless the court determines that the plaintiff has established that there is a probability that the plaintiff will prevail on the claim." (§ 425.16, subd. (b)(1).) With exceptions not relevant here, "a prevailing defendant on a special motion to strike shall be entitled to recover his or her attorney's fees and costs." (§ 425.16, subd. (c)(1).)

In evaluating an anti-SLAPP motion, courts conduct a two-step analysis. First, the court decides whether a defendant has met its "burden of establishing that the challenged allegations or claims 'aris[e] from' protected activity in which the defendant has engaged." (*Park, supra*, 2 Cal.5th at p. 1061, quoting § 425.16, subd. (b)(1).) For these purposes, protected activity "includes: (1) any written or oral statement or writing made before a legislative, executive, or judicial proceeding, or any other official proceeding authorized by law, (2) any written or oral statement or writing made in connection with an issue under consideration

---

[15] On this court's own motion, we take judicial notice of our above-referenced opinion in case number B292794.

29

or review by a legislative, executive, or judicial body, or any other official proceeding authorized by law, (3) any written or oral statement or writing made in a place open to the public or a public forum in connection with an issue of public interest, or (4) any other conduct in furtherance of the exercise of the constitutional right of petition or the constitutional right of free speech in connection with a public issue or an issue of public interest." (§ 425.16, subd. (e).)

Second, if a defendant meets its burden on the threshold showing, the court decides if the plaintiff "has established that there is a probability that the plaintiff will prevail on the claim." (§ 425.16, subd. (b)(1).) To satisfy this burden, the plaintiff " 'must demonstrate that the complaint is both legally sufficient and supported by a sufficient prima facie showing of facts to sustain a favorable judgment if the evidence submitted by the plaintiff is credited.' " (*Soukup v. Law Offices of Herbert Hafif* (2006) 39 Cal.4th 260, 291.) At this stage of the proceedings, a plaintiff "need only establish that his or her claim has 'minimal merit.' " (*Ibid.*) Although " 'the court does not *weigh* the credibility or comparative probative strength of competing evidence, it should grant the motion if, as a matter of law, the defendant's evidence supporting the motion defeats the plaintiff's attempt to establish evidentiary support for the claim.' " (*Ibid.*) "In making its determination, the court shall consider the pleadings, and supporting and opposing affidavits stating the facts upon which the liability or defense is based." (§ 425.16, subd. (b)(2).)

"Analysis of an anti-SLAPP motion is not confined to evaluating whether an entire cause of action, as pleaded by the plaintiff, arises from protected activity or has merit. Instead,

30

courts should analyze each claim for relief – each act or set of acts supplying a basis for relief, of which there may be several in a single pleaded cause of action – to determine whether the acts are protected and, if so, whether the claim they give rise to has the requisite degree of merit to survive the motion." (*Bonni*, *supra*, 11 Cal.5th at p. 1010, citing *Baral v. Schnitt* (2016) 1 Cal.5th 376, 393-395 (*Baral*).) "[T]o the extent any acts are unprotected, the claims based on those acts will survive." (*Bonni*, at p. 1012.)

We review the trial court's order granting the anti-SLAPP motion de novo, applying the same two-step analysis. (*Oasis West Realty, LLC v. Goldman* (2011) 51 Cal.4th 811, 820.)

## II. *Wilson and Bonni*

Both *Wilson* and *Bonni* concern only the first step of the anti-SLAPP analysis—evaluating whether the plaintiff's claim arises from any act of the defendant "in furtherance of the defendant's right of petition or free speech under the United States Constitution or the California Constitution in connection with a public issue." (§ 425.16, subd. (b)(1).)

In *Wilson*, our Supreme Court concluded the anti-SLAPP "statute contains no exception for discrimination or retaliation claims, and in some cases the actions a plaintiff alleges in support if his or her claim may qualify as protected speech or petitioning activity under section 425.16. In such cases, the plaintiff's allegations about the defendant's invidious motives will not shield the claim from the same preliminary screening for minimal merit that would apply to any other claim arising from protected activity." (*Wilson*, *supra*, 7 Cal.5th at p. 881.) "[E]ven if a plaintiff's discrimination [or retaliation] claim can be said to be based in part on the employer's purported wrongful motives, it

31

is necessarily *also* based on the employer's alleged acts—that is, the various outward 'manifestations' of the employer's alleged wrongful intent, such as failing to promote, giving unfavorable assignments, or firing." (*Id*. at pp. 886-887.) "If the *acts* alleged in support of the plaintiff's claim are of the sort protected by the anti-SLAPP statute, then anti-SLAPP protections apply." (*Id*. at p. 887.) "The defendant's first-step burden is to identify the activity each challenged claim rests on and demonstrate that that activity is protected by the anti-SLAPP statute." (*Id*. at p. 884.)

In *Bonni*, the Supreme Court reiterated that hospital "peer review proceedings are 'official proceeding[s]' within the meaning of section 425.16, subdivision (e)(2)." (*Bonni*, *supra*, 11 Cal.5th at p. 1013, citing *Kibler*, *supra*, 39 Cal.4th at p. 201.) The Court explained "the anti-SLAPP statute is potentially applicable in cases arising from hospital peer review," but the "scope of the statute's protections" depends on whether the plaintiff's claim is "based on protected speech and petitioning activity in connection with peer review proceedings" or "the disciplinary actions that result." (*Bonni*, at p. 1014.) Claims based on resulting disciplinary action are not protected under the anti-SLAPP statute. (*Id*. at p. 1026 ["the disciplinary actions central to Bonni's retaliation cause of action do not constitute protected activity and thus are not subject to a special motion to strike under the anti-SLAPP statute. To the extent Bonni's cause of action seeks to impose liability not for disciplinary actions but for statements made in the course of hospital peer review proceedings, the statute entitles the Hospitals to seek early review of the merits of Bonni's claims, just as they would be permitted to seek early review of any other claim arising from protected activity"].)

Like Dr. Melamed, the plaintiff in *Bonni* alleged defendant hospitals retaliated against him for raising patient care concerns by engaging in a list of "principal adverse actions or categories of conduct." (*Bonni*, *supra*, 11 Cal.5th at p. 1015.) The *Bonni* Court reviewed the list of acts on which the plaintiff based his retaliation claims and decided on which acts defendant hospitals met their burden of demonstrating the alleged activity was protected under the anti-SLAPP statute. The Court explained: "It does not matter that other unprotected acts may also have been alleged within what has been labeled a single cause of action; these are 'disregarded at this stage.' [Citation.] So long as a 'court determines that relief is sought based on allegations arising from activity protected by the statute, the second step [of the anti-SLAPP analysis] is reached' with respect to these claims." (*Id.* at p. 1010, quoting *Baral*, *supra*, 1 Cal.5th at p. 396.)

Below, we apply the Supreme Court's rationale to Dr. Melamed's list of defendants' alleged retaliatory acts.

## III. First Step Anti-SLAPP Analysis

As set forth above, each cause of action in Dr. Melamed's first amended complaint is based on the same list of 12 wrongful acts allegedly committed by defendants. Our task in the first step of the anti-SLAPP analysis is to determine whether each alleged act describes activity protected under the anti-SLAPP statute, applying the Supreme Court's rationale in *Bonni*.

### A. Alleged conduct that Dr. Melamed and defendants agree *is not* protected by the anti-SLAPP statute under *Bonni*'s rationale

The parties agree, as do we, that under the Supreme Court's rationale, alleged conduct constituting "disciplinary

33

actions"—rather than "statements made in the course of hospital peer review proceedings"—*is not* protected activity under the anti-SLAPP statute. (*Bonni, supra,* 11 Cal.5th at pp. 1019-1023, 1026.) Thus, the following conduct alleged in Dr. Melamed's 12-part list of defendants' alleged retaliatory acts *is not* subject to defendants' special motion to strike:[16]

"(1) Suspending [his] medical staff privileges to treat scoliosis and kyphosis with instrumentation with or without occipital fusion in adult, pediatric and adolescent patients";

"(10) Depriving [him] of his property right and interest to use certain hospital facilities and privileges"; and

"(12) Wrongfully terminating [his] hospital privileges[.]"

Claims based on these alleged acts survive defendants' anti-SLAPP motion. Accordingly, we reverse, in part, the trial court's order granting the motion.

**B.  Alleged conduct that Dr. Melamed and defendants agree *is* protected by the anti-SLAPP statute under *Bonni*'s rationale**

As the parties acknowledge, the Supreme Court made clear in *Bonni* that the following conduct alleged in Dr. Melamed's 12-part list of defendants' alleged retaliatory acts *is* protected by the anti-SLAPP statute:

"(3) Reporting [his] summary suspension to the Medical Board of California and National Practitioner Data Bank, as well as other persons/entities";

"(4) Abusing the powers of the peer review process and subjecting [him] to a lengthy and humiliating peer review process

---

[16] For ease of reference, we number the alleged acts according to their enumerated numerical order in Dr. Melamed's first amended complaint.

for over two years, and by refusing to lift [his] summary suspension despite recommendations by several separate boards/committees to do so";[17] and

"(9) Engaging in a campaign of character assassination which caused irreparable damage to [his] reputation[.]"

As the Supreme Court explained, reports to the Medical Board of California and National Practitioner Data Bank, "which were required by law [citations], are written statements to the state's licensing agency concerning restrictions imposed on [a physician] by a peer review body for allegedly providing substandard care" and are protected under section 425.16, subdivision (e)(2) as " 'statement[s] or writing[s] made in connection with an issue under consideration' in an 'official proceeding.' " (*Bonni*, *supra*, 11 Cal.5th at p. 1017, quoting section 425.16, subd. (e)(2).)

The Supreme Court further explained that the following conduct is also protected under section 425.16, subdivision (e)(2): "subjecting [a physician] to a 'lengthy and humiliating peer review process' "; and the hospital's "appellate committee's arguments before the peer review panel that the suspension should be upheld, as well as [the hospital]'s appellate committee's recommendation that some of the preliminary findings reached

---

[17] Dr. Melamed concedes this conduct is protected by the anti-SLAPP statute, acknowledging this allegation is not about the discipline itself—the summary suspension—but about the positions defendants took during the peer review process. As set forth above, the imposition of the summary suspension and any other disciplinary actions are not protected by the anti-SLAPP statute.

35

by that peer review panel be reversed." (*Bonni*, *supra*, 11 Cal.5th at pp. 1017-1018.)

Finally, the Supreme Court explained that the physician's claim of " 'character assassination' " describes "quintessential speech activities" and is "protected under section 425.16, subdivision (e)(2) to the extent the speech was made in connection with peer review." (*Bonni*, *supra*, 11 Cal.5th at p. 1016.)

Dr. Melamed concedes these alleged acts—enumerated in his first amended complaint as acts (3), (4), and (9), and quoted above—are protected by the anti-SLAPP statute. Accordingly, we proceed to the second step of the anti-SLAPP analysis with respect to claims based on these alleged acts.

### C. The remaining six categories of alleged conduct about which the parties disagree on the application of the anti-SLAPP statute under *Bonni*'s rationale

Dr. Melamed asserts the Supreme Court in *Bonni* concluded the other six categories of conduct Dr. Melamed alleged in his first amended complaint are *not* protected by the anti-SLAPP statute. Not so. The Supreme Court concluded the hospital defendants in *Bonni* did not meet their burden of establishing certain alleged acts are protected by the anti-SLAPP statute: "The complaint also identifies a handful of miscellaneous retaliatory conduct not explicitly tied to any specific event or action: that the Hospitals created a hostile work environment, blocked Bonni from career opportunities, failed to protect him from retaliation, subjected him to intolerable work conditions, and misused his private, confidential health information. The burden is on the Hospitals to demonstrate that

36

each of these allegations entails protected activity. [Citation.] In the trial court, the Hospitals did not address Bonni's allegations individually. In this court, they offer no argument directed at these allegations and do not explain how they arise from peer review proceedings or any other protected activity. Accordingly, they have not carried their burden." (*Bonni*, *supra*, 11 Cal.5th at pp. 1023-1024.)

Here, we are tasked with deciding whether defendants met their burden of establishing the six remaining alleged retaliatory acts arise from protected activity. We address the alleged acts in the order they were listed in the first amended complaint.

"(2) Unilaterally taking retaliatory action against [Dr. Melamed] without affording him due process, a hearing, an investigation, or any other meaningful opportunity or procedural protection for [him] to address the summary suspension before it was issued[.]" As defendants point out, the conduct at issue here is not the discipline resulting from the peer review process—the summary suspension—which we already addressed above as unprotected activity. Here, Dr. Melamed is alleging the peer review process—an official proceeding authorized by law within the meaning of section 425.16, subdivision (e)(2)—was unfair. Thus, he is challenging defendants' "speech and petitioning activity taken in connection with an official proceeding," conduct the anti-SLAPP statute protects. (*Bonni*, *supra*, 11 Cal.5th at p. 1014.) Accordingly, we proceed to step two of the anti-SLAPP analysis with respect to claims based on this alleged conduct.

"(5) Ongoing hostility in the work environment[.]" As defendants argue, to the extent this alleged conduct results from defendants' disciplinary actions, it is not protected by the anti-SLAPP statute; to the extent it arises from defendants' speech or

37

petitioning activity in connection with the peer review proceedings, it is protected.  Accordingly, we proceed to step two of the anti-SLAPP analysis with respect to claims based on the latter type of conduct.

"(6) Obstructing other economic and career opportunities for [him.]" Dr. Melamed alleges other hospitals either took adverse action against him or refused to grant him privileges to practice due to the summary suspension of his privileges at Cedars.  As defendants have shown, based on the evidence Dr. Melamed presented, the only action defendants took which led to other hospitals finding out about the summary suspension at Cedars was reporting the summary suspension to the Medical Board of California and the National Practitioner Data Bank.  As discussed above, making such reports is protected activity under the anti-SLAPP statute. (*Bonni*, *supra*, 11 Cal.5th at p. 1017.) Accordingly, we proceed to step two of the anti-SLAPP analysis with respect to claims based on this alleged conduct.

"(7) Failing to protect [him] from retaliation for whistleblowers and adverse actions[.]"  As defendants argue, to the extent the alleged retaliation is defendants' disciplinary actions, it is not protected by the anti-SLAPP statute; to the extent the alleged retaliation is the conduct arising from defendants' speech or petitioning activity in connection with the peer review proceedings (as specified in this opinion), it is protected.  Accordingly, we proceed to step two of the anti-SLAPP analysis with respect to claims based on the latter type of conduct.

"(8) Intolerable working conditions[.]"  As defendants argue, to the extent this alleged conduct results from defendants' disciplinary actions, it is not protected by the anti-SLAPP

38

statute; to the extent it arises from defendants' speech or petitioning activity in connection with the peer review proceedings, it is protected. Accordingly, we proceed to step two of the anti-SLAPP analysis with respect to claims based on the latter type of conduct.

"(11) Interfering with [his] right to practice his occupation." As defendants argue, to the extent this alleged conduct refers to Dr. Melamed's ability to practice at Cedars as a result of the discipline imposed, it is not protected by the anti-SLAPP statute; to the extent it refers to his ability to practice at other hospitals, it is protected. As defendants have shown, based on the evidence Dr. Melamed presented, the only actions defendants took that allegedly interfered with Dr. Melamed's ability to practice at other hospitals were reporting the summary suspension to the Medical Board of California and the National Practitioner Data Bank and speech and petitioning activity in connection with the peer review proceedings—conduct that is protected by the anti-SLAPP statute. (*Bonni*, *supra*, 11 Cal.5th at pp. 1016-1017.) Accordingly, we proceed to step two of the anti-SLAPP analysis with respect to claims based on the latter type of conduct.

To summarize, we conclude the following alleged conduct i*s not* protected by the anti-SLAPP statute and survives the anti-SLAPP motion: the summary suspension of Dr. Melamed's privileges at Cedars; hostility in the work environment and intolerable working conditions at Cedars resulting from defendants' disciplinary actions; failure to protect Dr. Melamed from retaliatory disciplinary actions at Cedars; deprivation of his property right and interest to use Cedars's facilities and privileges; interference with his ability to practice his occupation

39

at Cedars as a result of defendants' disciplinary actions; and wrongful termination of his hospital privileges at Cedars.[18]

We conclude the following alleged conduct *is* protected by the anti-SLAPP statute, and we proceed to step two of the anti-SLAPP analysis with respect to claims based on this conduct: taking retaliatory action against Dr. Melamed without affording him due process, etc.; reporting the summary suspension to the Medical Board of California and the National Practitioner Data Bank; subjecting him to a lengthy and humiliating peer review process; hostility in the work environment arising from the peer review process; obstructing other economic and career opportunities; failing to protect him from retaliatory conduct arising from defendants' speech or petitioning activity in connection with the peer review proceedings (not the discipline itself); engaging in a campaign of character assassination; and interfering with his ability to practice at other hospitals.

---

[18] Cedars did not terminate Dr. Melamed's privileges, but he claims he can no longer practice there due to hostility in the work environment and intolerable working conditions.

## IV.  Second Step Anti-SLAPP Analysis[19]

The Supreme Court's review of this case (and *Wilson* and *Bonni*) was limited to the first step of the anti-SLAPP analysis. The parties fully briefed the second step analysis before we issued our February 27, 2017 opinion, in which we reached the second step. The parties submitted additional briefing upon remand addressing the second step. We have no cause to alter our prior analysis concluding Dr. Melamed has not established a probability he will prevail on any claim based on alleged conduct protected under the anti-SLAPP statute, as we discuss more fully below.

### A.  Dr. Melamed has not established a prima facie case of a violation of Health and Safety Code section 1278.5

Dr. Melamed's first cause of action for retaliation against a whistleblower in violation of Health and Safety Code section 1278.5 is based in part on the conduct described above that we have concluded is protected by the anti-SLAPP statute. Health and Safety Code section 1278.5 provides, in pertinent part:

---

[19] Dr. Melamed urges this court not to address the second step anti-SLAPP analysis, representing in a brief upon remand that he will dismiss claims based on conduct this court determines is protected by the anti-SLAPP statute. Defendants object to such an approach, arguing Dr. Melamed may not amend his complaint on appeal to avoid a decision on the probability of his prevailing on causes of action which are based not only on conduct protected by the anti-SLAPP statute, but also unprotected conduct that will not be stricken from the complaint pending further proceedings on those causes of action in the trial court. We have no cause to decide only half of the issues before us on appeal.

"(a) The Legislature finds and declares that it is the public policy of the State of California to encourage patients, nurses, members of the medical staff, and other health care workers to notify government entities of suspected unsafe patient care and conditions. The Legislature encourages this reporting in order to protect patients and in order to assist those accreditation and government entities charged with ensuring that health care is safe. The Legislature finds and declares that whistleblower protections apply primarily to issues relating to the care, services, and conditions of a facility and are not intended to conflict with existing provisions in state and federal law relating to employee and employer relations.

"(b)(1) No health facility shall discriminate or retaliate, in any manner, against any patient, employee, member of the medical staff, or any other health care worker of the health facility because that person has done either of the following:

"(A) Presented a grievance, complaint, or report to the facility, to an entity or agency responsible for accrediting or evaluating the facility, or the medical staff of the facility, or to any other governmental entity.

"(B) Has initiated, participated, or cooperated in an investigation or administrative proceeding related to the quality of care, services, or conditions at the facility that is carried out by an entity or agency responsible for accrediting or evaluating the facility or its medical staff, or governmental entity.

"(2) No entity that owns or operates a health facility, or that owns or operates any other health facility, shall discriminate or retaliate against any person because that person has taken any actions pursuant to this subdivision."

42

Dr. Melamed alleges in the first amended complaint that defendants retaliated against him (by engaging in both protected and unprotected activity under the anti-SLAPP statute) because he "identified, reported and disclosed certain suspected unsafe and substandard conditions and services at [Cedars] that were a threat to patient care and safety." Dr. Melamed did not present evidence in connection with defendants' anti-SLAPP motion establishing a prima facie case that he presented a grievance, complaint, or report to Cedars or its medical staff regarding the quality of patient care, within the meaning of Health and Safety Code section 1278.5, and defendants retaliated against him for doing so. There is no evidence in the record before us of such a grievance, complaint, or report.

The evidence presented in connection with defendants' anti-SLAPP motion demonstrates Dr. Melamed approved the use of the Jackson table and the hip and thigh pads for D.W.'s surgery. Dr. Melamed positioned D.W. on the Jackson table and was satisfied with the stability of her position at the outset of the surgery.

Defendants presented evidence in support of their anti-SLAPP motion demonstrating there are two systems for reporting patient care and safety concerns, per Cedars's written policies: the MIDAS event reporting system and the MD Feedback Program. Dr. Melamed did not utilize either to report the alleged inadequate equipment during D.W.'s surgery. Rather, the peer review process concerning Dr. Melamed commenced after a nurse filed a formal electronic incident report through the MIDAS event reporting system regarding D.W.'s surgery and an operating room manager contacted Dr. Brien—

the physician responsible for initiating the investigation at the outset of the peer review process—to report the surgery.

In his appellant's opening brief in this appeal, Dr. Melamed asserts he "presented his concern about the hospital's inadequate equipment in numerous ways." First, he asked the operating room nursing staff mid-surgery if there were different hip and thigh pads and a different operating table available. He does not explain how a request for different equipment—after he approved the original equipment—could be construed as a grievance, complaint, or report about patient safety concerns within the meaning of Health and Safety Code section 1278.5, and we can conceive of no way to construe it as such.

Second, Dr. Melamed states he told D.W.'s parents there were some mechanical problems with the table and pads during surgery, and he would request the appropriate table and pads from Cedars and bring D.W. back into the operating room at Cedars soon for a corrective surgery. A grievance, complaint, or report about patient care safety concerns, within the meaning of Health and Safety Code section 1278.5, must be made to the hospital, its medical staff, an entity or agency responsible for accrediting or evaluating the hospital, or some other governmental entity. (Health & Saf. Code, § 1278, subd. (b)(1)(A).) A grievance, complaint, or report to the parents of a patient does not qualify under the express requirements of the statute. Moreover, Dr. Melamed's statements to D.W.'s parents do not indicate he had reportable concerns about patient safety at Cedars, as he intended to perform an additional surgery on D.W. at Cedars within the week using Cedars's equipment.

Third, Dr. Melamed states in his declaration in opposition to the anti-SLAPP motion that *after* Dr. Brien initiated the peer

44

review process and contacted him for an interview, he told Dr. Brien during the July 14, 2011 interview, in pertinent part: "it had been difficult to stabilize the patient due to the inadequate table/pads"; "the nursing personnel had told [him] that the correct table/pads were not available"; and "if [he] would have had the correct table/pads, the patient would have had a successful surgical outcome similar to [his] other cases."[20]  It is not clear how this could be construed as a grievance, complaint, or report about patient safety concerns, within the meaning of Health and Safety Code section 1278.5.  Dr. Melamed's statements to physicians who were investigating *his* patient care were not made in a forum where he could have expected the statements about inadequate equipment to be elevated as a whistleblower complaint to the appropriate staff or to accreditation or government entities.  Moreover, Dr. Melamed acknowledged during this interview with Dr. Brien that Cedars had the appropriate equipment for the corrective surgery he planned to perform on D.W. within the week.  What was the issue Cedars needed to remedy to ensure patient safety?

Fourth, Dr. Melamed points out that he documented the equipment issues in his operating report, which he dictated on July 14, 2011, after his interview with Dr. Brien.  The report was transcribed on July 15, 2011, the same day the medical staff sent Dr. Melamed notice of his summary suspension.  There is no evidence before us indicating the operating report was available to anyone involved in the summary suspension decision before the summary suspension was imposed.  In any event, Dr.

---

[20] As referenced above, Dr. Melamed represents he made similar statements in his July 29, 2011 meeting with Drs. Brien and Delamarter.

45

Melamed does not explain how an operating report could be construed as a grievance, complaint, or report about patient safety concerns, within the meaning of Health and Safety Code section 1278.5. As Dr. Romanoff explained in his supplemental declaration in support of defendants' anti-SLAPP motion, "Patient medical records, including Operative Reports, are not used for the purpose of alerting Medical Center or Medical Staff leadership about suspected unsafe patient conditions or quality of care concerns." Rather, the MIDAS event reporting system and the MD Feedback Program are used for that purpose, pursuant to Cedars's policies. Dr. Melamed did not file a report regarding patient safety care concerns through either system.

The position Dr. Melamed took in response to the July 15, 2011 summary suspension of his privileges—as set forth in the July 21, 2011 letter he sent to Dr. Romanoff through his attorney—makes clear he had no cause to report any patient safety concerns at Cedars. He stated in the letter that the Jackson table was "medically appropriate for this type of surgical procedure," and he pointed out that the doctor who performed the corrective surgery on D.W. also used the Jackson table. Dr. Melamed took the same position in his July 27, 2011 petition for writ of mandate, seeking to set aside the summary suspension and prevent Cedars from reporting the summary suspension to the California Medical Board or the National Practitioners Data Bank, a petition he later voluntarily dismissed. Given Dr. Melamed's position in response to the summary suspension that the table was appropriate, the physicians investigating Dr. Melamed's patient care would have had no reason to believe he was making a whistleblower complaint about inadequate

46

equipment that should be elevated to the appropriate staff or entities.

Dr. Melamed did not establish in connection with the anti-SLAPP motion that there is a probability he will prevail on his first cause of action for retaliation against a whistleblower in violation of Health and Safety Code section 1278.5. For the reasons explained above, even crediting all his evidence, he has not shown even minimal merit to his claim that he presented a grievance, complaint, or report to Cedars or its medical staff regarding the quality of patient care, within the meaning of Health and Safety Code section 1278.5, and defendants retaliated against him for doing so. Accordingly, the portions of his first cause of action which are based on conduct protected by the anti-SLAPP statute (as delineated above) are stricken. The merits of the portions of his first cause of action which are based on conduct that is not protected by the anti-SLAPP statute are not before us at this juncture.

## B. Dr. Melamed did not exhaust his administrative and judicial remedies as to his remaining claims

In *Westlake Community Hosp. v. Superior Court* (1976) 17 Cal.3d 465, our Supreme Court held that the exhaustion of administrative remedies doctrine applies to hospital peer review proceedings. Thus, "before a doctor may initiate litigation challenging the propriety of a hospital's denial or withdrawal of privileges, he must exhaust available internal remedies afforded by the hospital." (*Id*. at p. 469.) Furthermore, "whenever a hospital, pursuant to a quasi-judicial proceeding, reaches a decision to deny staff privileges, an aggrieved doctor must first succeed in setting aside the quasi-judicial decision in a

47

mandamus action before he may institute a tort action for damages." (*Ibid*.) Once a court determines in a mandate action that the hospital's quasi-judicial decision was proper, the "excluded doctor may proceed in tort against the hospital, its board or committee members or any others legally responsible for the denial of staff privileges." (*Ibid*.)

In *Fahlen v. Sutter Central Valley Hospitals* (2014) 58 Cal.4th 655, our Supreme Court held "when a physician claims, under [Health and Safety Code] section 1278.5, that a hospital's quasi-judicial decision to restrict or terminate his or her staff privileges was itself a means of retaliating against the physician 'because' he or she reported concerns about the treatment of patients, the physician need not first seek and obtain a mandamus judgment setting aside the hospital's decision before pursuing a statutory claim for relief." (*Id.* at p. 660.) Thus, Dr. Melamed's first cause of action, which we addressed above, is not subject to the exhaustion of judicial remedies doctrine. The Supreme Court in *Fahlen* did not review the Court of Appeal's conclusion that the exhaustion of judicial remedies doctrine applied to the plaintiff's other statutory and common law claims, including the plaintiff's cause of action under Business and Professions Code sections 510 and 2056 (which Dr. Melamed also asserts). (*Fahlen*, at p. 666.)

Dr. Melamed does not dispute the exhaustion of administrative and judicial remedies doctrines apply to claims styled as his second through seventh causes of action—tortious interference with prospective economic relations, tortious interference with contractual relations, unfair competition (Bus. & Prof. Code, § 17200 et seq.), violation of the Cartwright Act (Bus. & Prof. Code, § 16700 et seq.), violations of Business and

48

Professions Code sections 510 and 2056, and wrongful termination of hospital privileges. What he argues is that he was the victor in the peer review proceedings and there were no unfavorable determinations for him to set aside before bringing this action. We disagree.

Prior to filing this action, Dr. Melamed did not overturn the peer review findings that were unfavorable to him through a petition for writ of administrative mandate. The unfavorable findings were that it was reasonable and warranted to impose the summary suspension and that it was "reasonable and warranted for the Medical Executive Committee to authorize a prospective review of the clinical management of Dr. Melamed's pediatric and adolescent scoliosis cases by a method to be determined by the Department of Orthopedic Surgery."

After we issued our February 27, 2017 opinion in this case, concluding Dr. Melamed's second through seventh causes of action in the first amended complaint were barred by his failure to exhaust judicial remedies, he filed a petition for writ of administrative mandate, which the trial court denied (in case No. BS169534). As discussed above, we dismissed his appeal from the denial of the petition because he was challenging an aspect of the peer review process that he did not challenge at the peer review hearing—the medical staff's August 1, 2011 decision to *continue* the summary suspension for more than 14 days necessitating reports to the Medical Board of California and the National Practitioner Data Bank. Accordingly, he failed to exhaust his administrative remedies. (*Melamed v. Cedars-Sinai Medical Center*, *supra*, B292794.)

Dr. Melamed cannot establish a probability of prevailing on the portions of his second through seventh causes of action that

49

are based on alleged conduct which is protected by the anti-SLAPP statute because he failed to exhaust administrative and judicial remedies. He has not obtained administrative or judicial findings that the peer review process lacked due process or was unfair; that the summary suspension should not have been imposed; or that the summary suspension should not have been reported to the Medical Board of California or the National Practitioner Data Bank. Such findings are essential to these claims.

Accordingly, the portions of Dr. Melamed's second through seventh causes of action which are based on conduct protected by the anti-SLAPP statute (as delineated above) are stricken. The merits of the portions of his second through seventh causes of action which are based on conduct that is not protected by the anti-SLAPP statute are not before us at this juncture.[21]

---

[21] To the extent a retaliation claim under Business and Professions Code sections 510 and 2506 is not subject to the exhaustion of judicial remedies doctrine like a claim under Health and Safety Code section 1278.5—a position Dr. Melamed does not advance on appeal—the result on his sixth cause of action would be no different. Dr. Melamed did not present evidence establishing a prima facie case that defendants retaliated against him because he "protest[ed] a decision, policy, or practice" that he "reasonably believe[d] impair[ed] [his] ability to provide appropriate health care to his . . . patients." (Bus. & Prof. Code, §§ 510, subds. (a)-(b) & 2506, subds. (a)-(b).) It is not clear what decision, policy, or practice he protested given he acknowledged Cedars had the appropriate equipment for him to perform the corrective surgery on D.W., and he insisted the Jackson table that he chose for D.W.'s surgery (and the other physician used to perform the subsequent corrective surgery on D.W.) was the appropriate operating table.

50

## DISPOSITION

The order granting the anti-SLAPP motion is affirmed in part and reversed in part as specified in this opinion, and the cause is remanded to the trial court for further proceedings consistent with this opinion, including the matter of attorney fees under Code of Civil Procedure section 425.16, subdivision (c). Each side is to bear his/their own costs on appeal.

NOT TO BE PUBLISHED

                                                CHANEY, J.

We concur:


BENDIX, Acting P. J.


CRANDALL, J.*

---

\* Judge of the San Luis Obispo County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

51